[No. E049392. Fourth Dist., Div. Two. Jan. 10, 2011.]

KARAN ERIKSSON et al., Plaintiffs and Appellants, v.
KRISTI NUNNINK, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION‡]**

‡Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part IV.A.

COUNSEL

Butler & Dodge, Terrence L. Butler and Anne G. Koza for Plaintiffs and Appellants.

Horvitz & Levy, Lisa Perrochet, James A. Sonne; Soltman, Levitt, Flaherty & Wattles and Garth M. Drozin for Defendant and Respondent.

## OPINION

## KING, J.—

### I. INTRODUCTION

Plaintiffs and appellants Karan and Stan Eriksson were the parents of Mia Eriksson.[1] Mia was an avid horse rider and equestrian competitor. Defendant and respondent Kristi Nunnink was Mia's riding coach. In November 2006, Mia participated in an equestrian competition at Galway Downs (Galway) in Temecula. She was 17 years old at the time. Although Mia's horse was recently injured in another competition, Nunnink persuaded Mia's mother, Karan, that the horse was fit to ride in the Galway event. Based on Nunnink's representations, Karan allowed Mia to compete. During the cross-country portion of the competition, Mia's horse tripped over a hurdle. With the Erikssons looking on, Mia fell off the horse and the horse fell on Mia, causing Mia's death.

The Erikssons sued Nunnink for wrongful death and negligent infliction of emotional distress. They alleged that Nunnink "increased the risk [of harm] reasonably assumed by" Mia when she allowed Mia to ride a horse that "was unfit to ride because of prior falls and lack of practice" and concealed this condition from the Erikssons. Nunnink moved for summary judgment, which the trial court granted. After the entry of judgment, the Erikssons appealed.

Nunnink's motion was based on the doctrines of primary assumption of the risk and express contractual assumption of the risk. More specifically, Nunnink argued that the risk of death or serious injury to the horse rider is inherent in the sport of cross-country jumping and, alternatively, that Mia and Karan signed a preaccident release, releasing Nunnink from any and all liability. Based on these arguments, Nunnink contended that the facts "show that [she] neither owed nor breached any duty, legally causing" the accident involving Mia. The trial court granted the motion. We reverse.

As to primary assumption of the risk, i.e., the element of duty, Nunnink failed to set forth facts in her separate statement of undisputed facts negating the Erikssons' allegation that Nunnink increased the risk of injury to Mia by allowing her to ride a horse that was "unfit to ride because of prior falls and lack of practice." Nunnink also failed to meet her burden of production as it

---

[1] For ease of reference, we will refer to plaintiffs collectively as the Erikssons or individually by their first names. To avoid confusion, we will refer to Mia Eriksson as Mia.

relates to the element of breach of duty. As to express contractual assumption of the risk, Nunnink again failed to meet her burden of production that she was not grossly negligent. We further conclude that, even if Nunnink met her initial burden, triable issues of fact exist as to duty, breach of duty, and gross negligence. As for causation, if Nunnink's undisputed statement of facts addressed the issue, the Erikssons have demonstrated a triable issue of fact.[2]

## II. FACTUAL SUMMARY

Mia began riding horses at age six and had trainers and coaches from that time on. She began competing at age 13 or 14. By the time of her death at age 17, she had participated in 25 to 30 "eventing" competitions and other horse shows. The sport of eventing involves three days of competition, including dressage, cross-country, and show jumping. Dressage is considered the least risky; cross-country the most dangerous. In 2006, Mia participated in eight such competitions in which she finished as high as fifth place and as low as 18th place. She competed approximately eight times in 2005 and five or six times in 2004.

Mia trained for eventing at Tahoe Meadows, a 25-acre equestrian facility owned by the Erikssons. Nunnink was her coach. Nunnink has been a professional trainer of horse riders for equestrian competitions for 25 years. She gave Mia three horse riding lessons each week, each lasting from one to three hours.

Mia's preferred horse for eventing was Koryography, or "Kory," a gelding owned by the Erikssons. In 2006, Kory was approximately seven years old. The regular care and feeding of Kory was performed by "Alfredo, the on-site person" at Tahoe Meadows, with Mia providing additional care. At competitions, Mia would equip, or "tack," Kory herself.

Nunnink considered herself to be Mia's coach, as distinguished from a trainer of Mia's horse. Although Nunnink was not responsible for Kory's regular care and feeding, Karan testified that she was "completely responsible for the horse" and was required "to make sure the horse was fit and ready to go" before an event. Nunnink attended all of Mia's eventing competitions, and would walk the courses with Mia and help her warm up for the events. Nunnink states that she was "personally familiar" with Kory and his "tendencies, abilities, and capacity of responding to Mia['s] commands . . . ." She also stated she would "have said something" if she felt that Mia's horse should not be competing.

---

[2] In the nonpublished portion of the opinion we reject an argument by Nunnink that an evidentiary ruling had the effect of striking virtually all of the Erikssons' evidence submitted in opposition to the motion for summary judgment.

On May 21, 2006, Mia and Karan signed a document titled "RELEASE OF LIABILITY," in favor of Nunnink. The relevant terms of this agreement will be discussed below.

From the beginning of 2006, one of Mia's competitive goals for the year was to compete in a "two star" eventing competition at Galway. The event was to be held on November 3 through 5, 2006. It would be the first two star event Mia ever attempted. A two star event is more difficult than a one star event in that it has more jumps, the jumps are higher and wider, the speed is faster, and the course is longer. It was the highest level in terms of difficulty, size, and speed that Mia had attempted. Mia and Karan submitted an entry form for the event early in 2006.[3]

In September 2006, Mia competed in an event at Twin Rivers. There, according to Karan, "Kory rapped a fence really severely," resulting in a "big bruise." A veterinarian examined Kory and said "the horse could be iced and if he trotted out okay in the morning[,] she could jump him."

After Twin Rivers, according to Karan, Nunnink was worried about the cross-country course at Galway and "didn't like how Kory was going." Nunnink "wanted Mia to have more mileage" prior to Galway. Because of these concerns, Nunnink entered Mia in a three-day competition in Fresno known as "Ram Tap." Karan and Nunnink agreed that if Kory "had trouble" at Ram Tap, "that was the end of the season."

The Ram Tap event took place on October 20 through October 22, 2006—two weeks before the Galway competition. Mia, riding Kory, completed the dressage portion of the event. On the second day, Kory tripped on a hay bale during the cross-country course and fell to his knees, causing the horse's head and nose to hit the ground. A veterinarian examined Kory and found that the horse suffered a concussion, an abrasion on his forehead, swelling and a hematoma on the pectoral area, a minor contusion in the chest, and small abrasions on his pectoral region. The veterinarian prescribed medication to reduce inflammation and recommended the use of ice to reduce swelling. Kory was withdrawn from the remainder of the Ram Tap competition. The next day, the veterinarian examined Kory again and found that the swelling had improved and made the following note: "complete exam—normal." The veterinarian also noted that Kory's next show was in two weeks. The veterinarian prescribed additional medicine, stated that the horse should be closely monitored for signs of head trauma, and instructed the Erikssons to follow up with their regular veterinarian.

---

[3] The entry form signed by Mia and Karan states: "I am fully aware and acknowledge that horse sports and the Competition involve inherent dangerous risks of accident, loss, and serious bodily injury including broken bones, head trauma, pain, suffering, or death . . . ."

Based upon the "trouble" Kory experienced at Ram Tap, Karan believed that Kory was a "lame" horse and that Mia's eventing season was over. In her declaration, Karan stated, "it had been decided after the fall at Ram Tap . . . that [Mia] would not be competing in the cross-country" at Galway. Accordingly, Kory's shoes were changed, he "was removed from feed," and they "did all the normal stuff that you do when a horse is done." Kory did not practice any jumps during the week after Ram Tap. As far as Karan was concerned, "everybody was done."

Although Mia was not to compete, Karan gave Mia permission to go to Galway because it was the end of the eventing season and Mia wanted to go to the parties and be with friends.

Karan testified to being misled about Mia's intentions at Galway: "there was," she said, "a little plot going on here" between Mia and Nunnink. Nunnink told Karan that they were "just going to throw the horse in the trailer so that it can get walked down there [at Galway]." Mia and Kory then travelled by car and trailer to Galway on Monday or Tuesday prior to the event. Nunnink arrived on Thursday, November 2, 2006. After Nunnink, Mia, and Kory arrived at Galway, Nunnink called Karan and said that Kory was "going smoothly" and they were "just going to ride dressage." Although Karan expressed concern because Kory still "had a huge wound thing going on," she agreed to allow Mia to perform the dressage portion of the competition.

The Galway course was designed, erected, maintained, and sanctioned by the United States Equestrian Federation and the United States Eventing Association. According to the rules applicable to the Galway event, each horse is checked by a veterinarian upon arrival and again prior to the dressage event. The first check, according to the rules, is "to establish first each horse's identity and veterinary history (vaccination, etc.) and second, each horse's state of health (but not its soundness)." According to an event official, the "primary reason for that examination is to make sure the horse is not sick and going to infect the other horses in the barn. It's basically you don't want an ill horse to contaminate other horses." There is no evidence in the record regarding the performance or results of this check on Kory.

The second examination takes place before a committee comprised of the event's ground jury and a veterinarian. For this examination, the competitors, with horse in hand, trot the horse in front of and away from the committee. According to the rules, "[t]he committee has the right and the duty to eliminate from the competition any horse that they judge is unfit, whether on

account of lameness, lack of condition or for any other reason. In a doubtful case the Ground Jury may direct that the horse be put in an officially supervised holding area for examination by the Associate Veterinarian."[4] Kory was not excluded from the competition by either of these examinations.

On Friday, November 3, 2006, Mia and Kory performed the dressage event at Galway. Mia scored 72.20. In dressage, a lower score is better than a higher score. This score placed Mia 41st out of 45 contestants.

Mia called Karan after the dressage event and said they were "going to run" the cross-country event the next day. Karan testified at her deposition that she told Mia, "absolutely not. We had [an] agreement with [Nunnink] well prior to this [that] the horse was not going to run any more at the end of this year. . . . The horse was hurt at Ram Tap and we had [an] agreement. . . . I said you are not running. I withdraw any permission to run." She told Mia to have Nunnink call her.

Karan spoke with Nunnink later that day. At her deposition, Karan described the conversation as follows: "I said [to Nunnink] there is no way she can run. When we do events, we go down ahead of time, we stay there, we feed her. We make sure she's sleeping. She's just down there having a good time." Nunnink told Karan that Mia "did really well. She got a 50 in dressage. The horse is good to go. He's going to go tomorrow."[5] Karan told Nunnink, "absolutely not. I'm on my way down there."[6] Karan arrived at Galway late that night.

The next morning, Saturday, November 4, 2006, Karan spoke to Nunnink twice, once in a barn and later in the warmup ring. At the barn, Nunnink told Karan not to worry, that Kory was "fine, he's great, you know, he's good." She warned Karan not to "get Mia upset" and not to "get everybody all rattled." Karan asked Nunnink if Kory "is schooled," and Nunnink told her, "yeah, we've been jumping [(i.e., practicing)] all week. He's good."[7] Later, at the warmup ring, Karan asked Nunnink "if she was, you know, absolutely

---

[4] The rules further provide: "At any other time during the competition, any individual member of the Ground Jury has the right and the duty to eliminate any horse, which in his opinion is lame or unfit to continue."

[5] In a declaration submitted in opposition to the motion for summary judgment, Karan states: "During the telephone call, [Nunnink] repeatedly assured me that the horse was doing very well despite its recent fall and injuries, that it had been jumping during the week and it was 'good to go.' She told me that Mia had done well in the dressage and had gotten a '50.' "

[6] Nunnink testified that she did not have a telephone conversation with Karan on that day.

[7] Karan testified that she later discovered that Kory "was not jumped and [Nunnink] made this more dangerous than it needed to be."

certain and she said, you know, I'm the coach, shut up. It's fine. Get out of here. You're making everybody nervous." Nunnink also assured Karan that if Kory did not look good, she would "pull him" from the competition.[8]

Karan did not tell Mia that she was not allowed to ride in the competition because, according to Karan, Nunnink "had already made the decision that she was going to ride." Nor did she inform any Galway event official that Mia was not permitted to compete in the event. Karan explained that she did not overrule Nunnink's decision and allowed Mia to compete because she "relied on [Nunnink's] expertise as a trainer."

That morning, Nunnink and Mia walked and examined the entire course. In Nunnink's declaration, she stated that the course was "very challenging," yet one in which Mia "had the necessary training, capabilities, and experience to negotiate with her horse, Koryography"; the obstacles, jumps, and fences were "very obvious and plain to view, and quite negotiable . . . ." Mia walked the course an additional time before the competition. Each walk took approximately one hour or one hour 15 minutes. According to Nunnink, Mia practiced and warmed up with Kory on the official practice course without apparent difficulty. No one, including Mia, complained to Nunnink that Kory was behaving in a manner that suggested the horse would be a danger to Mia in the competition.

The cross-country course at Galway includes numerous hurdles, or fences, over which the horse must jump. Each is numbered. (A pair of fences placed close together is identified by a single number and an "A" for the first fence in the pair and a "B" for the second.) Under the competition rules applicable at Galway, if a horse stops, or refuses to jump a fence four times, the rider is immediately and automatically disqualified from the competition.[9]

In a declaration submitted in support of her motion for summary judgment, Nunnink states that Mia "was an experienced equestrian competitor . . . and had demonstrated that she was capable of responsibly competing" at Galway. Nunnink based this on her "own observation in light of [her] expertise in riding, training, and observation of such events over more than 25 years." She

---

[8] At another point in her deposition testimony, Karan described these conversations more generally: "I spoke to her twice, once in the barn and once down in the warmup ring. Expressed my concern. I told her I didn't want the horse to go and in each case she said he's good to go. He's good to go. We're going to go. So in her professional opinion he was good to go."

[9] Nunnink states that she also had her own "barn rules," which dictated that a rider must cease competing once she had two stops in a competition. However, according to Karan, Nunnink did not have such a rule and, indeed, "had a practice of telling Mia to keep riding despite the number of refusals. . . ."

further states that, based upon her own riding of Kory, her training of Mia on the horse, and observing the horse being put through the type of skills required for the Galway event, Kory was capable of successfully competing in the Galway event.

Shortly after Mia began her run on the Galway cross-country course, Nunnink became concerned. At fence 10A, Kory made his third stop. By this time, it was obvious to Nunnink that Mia and Kory "were not having a good day and things were not going well." According to Karan, the hematoma that Kory had developed at Ram Tap was "clearly agitating him" during the run. Nunnink was surprised that Mia did not pull out of the competition and "call it a day."[10]

Kory made a fourth refusal at fence 17B, disqualifying Mia. Nevertheless, Mia continued.[11] Course officials began looking for a safe location to intervene. The fence judge at fence 20 was directed to stop Mia. Mia did not get there. At fence 19, Kory balked, then tripped over the hurdle. Mia was sent over Kory's head and onto the ground. Kory then fell and landed on Mia, injuring her. Mia was taken to a hospital, where she died later that day as a result of her injuries.

Two or three months after Mia's death, Nunnink was at Tahoe Meadows. She was with Sue Pipal, an acquaintance or friend of Karan. As they looked at Kory, Nunnink stated, "out of the blue," " 'Karan told me not to let Mia ride.' "

When Nunnink was asked at her deposition for her opinion as to what caused the fall, Nunnink answered: "Obviously the horse and Mia did something wrong. It just seemed to me that the horse didn't want to go out that day, and Mia kept encouraging him, and at some point he—he made a mistake."

## III. PROCEDURAL HISTORY

The Erikssons sued Nunnink and other parties in May 2008. They alleged two causes of action against Nunnink: the third cause of action for negligence and the seventh cause of action for negligent infliction of emotional distress. The Erikssons alleged that Nunnink "coached, supervised, and provided

---

[10] Competition rules barred a rider's trainer and parents from communicating with the rider during the event.

[11] Nunnink speculated that Mia "was fueled up on adrenalin and not thinking very clearly and probably was not cognizant at that time that she had had four stops."

services for the event which substantially increased the risk reasonably assumed by [Mia] because, among other things, the course was made more dangerous in order to make the competition more *thrilling to spectators*, thereby significantly increasing the risk of severe injury or death or negligently violated the established and recognized standards of care for protection of riders and horses imposed on and assumed by the various individuals pursuant to the promulgations, regulations, rules and practices and procedures of the sport's governing bodies; *and the horse that [Mia] rode was unfit to ride because of prior falls and lack of practice and this unfit condition was concealed from [the Erikssons] . . . ."* (Italics added.) According to the complaint, Mia's death was caused by "the combined negligence and fault of each of the defendants . . . , *which increased the risk of her serious injury or death and was not assumed by her or [the Erikssons] prior to the injury. . . ."* (Italics added.)

In support of their negligent infliction of emotional distress claim, the Erikssons alleged that they "were in the audience watching their daughter while she participated in the subject event . . . [and] observed their daughter and her horse fall while attempting to jump one of the fences and the horse fall onto and crush [Mia], causing her to suffer fatal injuries."

Nunnink answered the complaint in June 2008. In February 2009, she filed a motion for summary judgment on the ground that, as to her, the complaint "has no merit, as there is no triable issue as to any material fact to put before a jury . . . ." More particularly, she argued (1) she had no duty to Mia; (2) she breached no duty owed to Mia; (3) nothing Nunnink did or failed to do legally caused any damage to Mia; (4) recovery is barred by the doctrine of primary assumption of the risk; and (5) the Erikssons expressly, in writing, agreed to hold Nunnink harmless from any claim arising from Mia's use of Nunnink's services.

Following a hearing, the court granted the motion. In the judgment, the court stated: "There was no showing of competent evidence fulfilling the requisite elements of duty, breach of duty, and legal causation on the part of [Nunnink], legally causing the subject incident . . . , and the action is barred by the primary assumption of the risk doctrine." The Erikssons appealed.

## IV. ANALYSIS

A. *The Trial Court's Evidentiary Ruling*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

\*See footnote, *ante,* page 826.

B. *Legal Principles Concerning Nunnink's Duty and the Doctrine of Primary Assumption of the Risk*

■ Both causes of action asserted against Nunnink are based upon Nunnink's alleged negligence toward Mia.[12] An essential element of an action for negligence is the existence of a duty of care to the plaintiff. (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 [11 Cal.Rptr.2d 51, 834 P.2d 745].) The existence and scope of a defendant's duty is an issue of law to be decided by the court. (*Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 161 [41 Cal.Rptr.3d 299, 131 P.3d 383]; *Laabs v. Southern California Edison Co.* (2009) 175 Cal.App.4th 1260, 1272 [97 Cal.Rptr.3d 241] [Fourth Dist., Div. Two].) As such, it is generally amenable to resolution by summary judgment. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1004 [4 Cal.Rptr.3d 103, 75 P.3d 30] (*Kahn*); *Garcia v. W&W Community Development, Inc.* (2010) 186 Cal.App.4th 1038, 1044–1045 [112 Cal.Rptr.3d 394] [Fourth Dist., Div. Two].)

■ As a general rule, all persons have a duty to use ordinary care to prevent others from being injured as a result of their conduct. (*Rowland v. Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561]; see also Civ. Code, § 1714.) Courts have, however, made exceptions to this general rule based on public policy considerations. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 477 [110 Cal.Rptr.2d 370, 28 P.3d 116].) Indeed, the determination that a duty exists in a particular situation is ultimately " 'an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' " (*Dillon v. Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912].) This determination must be made on a case-by-case basis. (*John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1193 [45 Cal.Rptr.3d 316, 137 P.3d 153].)

■ One exception to the general rule of due care frequently applied in cases involving sports is the doctrine of primary assumption of the risk. (*McGarry v. Sax* (2008) 158 Cal.App.4th 983, 999 [70 Cal.Rptr.3d 519].) The seminal case in the area is *Knight v. Jewett* (1992) 3 Cal.4th 296, 313 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*). *Knight* involved an action by a participant in a touch football game who was injured by the defendant, another participant. (*Id.* at pp. 300–301.) In affirming summary judgment for

---

[12] The first cause of action, labeled "Negligence," is for wrongful death. The cause of action is authorized by Code of Civil Procedure section 377.60, which permits a "cause of action for the death of a person caused by the wrongful act or neglect of another." Under this statute, "recovery is authorized when death results from either a negligent or an intentional wrongful act." (6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1381, p. 801.)

the defendant, the court explained: "Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport. Thus, although a ski resort has no duty to remove moguls from a ski run, it clearly does have a duty to use due care to maintain its towropes in a safe, working condition so as not to expose skiers to an increased risk of harm." (*Id.* at pp. 315–316.)[13]

*Knight* emphasized the consequences, from a public policy perspective, of imposing a duty of care on participants in a sporting event: "[I]n the heat of an active sporting event like baseball or football, a participant's normal energetic conduct often includes accidentally careless behavior. The courts have concluded that vigorous participation in such sporting events likely would be chilled if legal liability were to be imposed on a participant on the basis of his or her ordinary careless conduct. The cases have recognized that, in such a sport, even when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of *legal liability* for such conduct might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity that falls close to, but on the permissible side of, a prescribed rule." (*Knight, supra,* 3 Cal.4th at pp. 318–319.) The court held that a *participant in a sport owes no duty to protect a coparticipant* from "ordinary careless conduct committed during the sport"; rather, the participant breaches a duty of care and is subject to liability only if he or she "intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Id.* at pp. 318, 320, fn. omitted.)

After establishing the nature and scope of the duty owed to the plaintiff, the *Knight* court proceeded to consider whether the defendant breached this duty as a matter of law. (*Knight, supra,* 3 Cal.4th at p. 320.) Based on the evidence submitted by the parties, the court declared "that defendant was, at most, careless or negligent in knocking over plaintiff, stepping on her hand, and injuring her finger." (*Ibid.*) As such, the conduct was "not even closely comparable to the kind of conduct—conduct so reckless as to be totally

---

[13] Only three justices signed on to the lead opinion in *Knight.* Justice Mosk wrote separately, generally concurring in the plurality's analysis. (*Knight, supra,* 3 Cal.4th at p. 321 (conc. & dis. opn. of Mosk, J.).) Nevertheless, the lead opinion has generally been cited by courts without notation of it as a plurality decision. As the Supreme Court subsequently and unanimously stated, the "basic principles of *Knight*'s lead opinion [is] the controlling law." (*Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1067 [68 Cal.Rptr.2d 859, 946 P.2d 817].)

outside the range of the ordinary activity involved in the sport—that is a prerequisite to the imposition of legal liability upon a participant in such a sport." (*Id.* at pp. 320–321.) Accordingly, the defendant did not breach any legal duty of care owed to the plaintiff and summary judgment was properly granted. (*Id.* at p. 321.)

Shortly after *Knight*, the issue of primary assumption of the risk was addressed in two decisions involving the liability of equestrian coaches: *Tan v. Goddard* (1993) 13 Cal.App.4th 1528 [17 Cal.Rptr.2d 89] (*Tan*) and *Galardi v. Seahorse Riding Club* (1993) 16 Cal.App.4th 817 [20 Cal.Rptr.2d 270] (*Galardi*). In *Tan*, the plaintiff, Joo Leong Tan, was a student at the defendant's school for training horse jockeys. (*Tan, supra*, at p. 1530.) One of the school's horse trainers, Bill Davis, told Tan that one of the horses, Faraway Falcon, had injured its left foot and that Tan "should ride the horse easily 'to see how it was.' " (*Id.* at p. 1531.) Tan found that Faraway Falcon did not walk or behave normally. (*Ibid.*) He reported this to the trainer and asked whether the horse was fit to ride. The trainer assured him it was and gave Tan instructions on where and how to ride the horse. (*Ibid.*) Tan followed the instructions. (*Ibid.*) Later, with the knowledge that the horse "was still 'off,' " the trainer instructed Tan to jog the horse on the school's outer track in a direction opposite from that in which horses are normally ridden. (*Ibid.*) The outer track was very rocky. (*Ibid.*) Tan followed the instructor's direction. (*Ibid.*) The horse "went down on the track," injuring Tan. (*Ibid.*)

After discussing *Knight*, the *Tan* court found it distinguishable. "Our case," the court began, "is different. Here, we do not deal with the relationship between coparticipants in a sport, or with the duty that an operator may or may not owe to a spectator. Instead, we deal with the duty of a coach or trainer to a student who has entrusted himself to the former's tutelage. There are precedents reaching back for most of this century that find an absence of duty to coparticipants and, often, to spectators, but the law is otherwise as applied to coaches and instructors. For them, the general rule is that coaches and instructors owe a duty of due care to persons in their charge. [Citations.] The coach or instructor is not, of course, an insurer [citation], and a student may be held to notice that which is obvious and to ask appropriate questions [citation]. But all of the authorities that comment on the issue have recognized the existence of a duty of care. [¶] As we have noted, the *Knight* court makes several references to the role of the defendant in relation to the sport or activity as being an important aspect of the inquiry about duty. If the role is that of coparticipant, there generally is no duty with respect to ordinary negligence. But here we are dealing not with a sports participant, but with an instructor who is training a student how to become a participant. [¶]

According to his testimony and declaration, Tan placed himself in the hands of the jockey school's riding trainer. He did what the instructor, Davis, told him to do. Davis was not a coparticipant in sport with Tan, but was charged with instructing him how to ride a horse. It was Davis who assigned Faraway Falcon to Tan to ride, knowing that the horse was 'off' due to an injury; it was Davis who told Tan to jog the horse on the outer track on the school's premises; and it was he who knew, or should have known, of the rocky condition of that track." (*Tan, supra,* 13 Cal.App.4th at pp. 1534–1535.) The court concluded that *"Davis's role as riding instructor to Tan was such that he owed Tan a duty of ordinary care to see to it that the horse he assigned Tan to ride was safe to ride under the conditions he prescribed for that activity. His failure to do so is analogous to the example, cited in Knight, of the duty of the ski resort operator to use due care to maintain its towropes in a safe condition."* (*Id.* at pp. 1535–1536, some italics added, citing *Knight, supra,* 3 Cal.4th at p. 316.)

In *Galardi, supra,* 16 Cal.App.4th 817, the plaintiff, Leslie Galardi, was an accomplished equestrian who had, for years, appeared in horse shows involving performance jumps and obstacles of various types. (*Id.* at pp. 819–820.) She was preparing for an upcoming show with her horse, Tomboy, at the defendant's riding club. (*Id.* at p. 820.) With Galardi's knowledge, an instructor at the club twice raised the height of two jumps without lengthening the distance between them. (*Ibid.*) The trainer then asked Galardi to ride through the course backward. (*Ibid.*) The horse successfully jumped the first jump but landed too close to the second jump. (*Ibid.*) The horse popped up into the air and knocked down the second jump, causing Galardi to fall and sustain injuries. (*Ibid.*)

The *Galardi* court applied "the analytical framework established by the Supreme Court" in *Knight* by looking "both to the *nature* of the sport and to the *roles and relationship* of the parties." (*Galardi, supra,* 16 Cal.App.4th at p. 822.) In reversing summary judgment, the court explained: "Clearly, the sport of horse jumping has the inherent risk that both horse and rider will fall and suffer injury. The basic competitive character of the sport involves engaging increasingly higher jumps and at shorter intervals until at some point the competitors can no longer clear the obstacles without substantial contact. Collisions with the jumps and ensuing falls are thus an integral part of the sport. Riders may also fall from the horse as the result of other conditions such as a balking or stumbling mount. Such risks were clearly among those which plaintiff here knowingly encountered during her training, when the jumps were raised, intervals became more hazardous, and directions were reversed. [¶] However, the occasion of plaintiff's fall and injury was not during competition with other riders. Instead, she had placed her training in the hands of defendants, who were employed to instruct and coach her. Their

responsibilities were directly to plaintiff. While other riders, as coparticipants, would not have any special duty of care to plaintiff during competition to ensure she did not fall, defendants certainly had a duty to avoid an unreasonable risk of injury to plaintiff and to take care that the jumping array was not beyond the capability of horse and rider. Of course, the risk of injury, inherent in plaintiff's activity, cannot be eliminated and in fact creates the challenge which defines the sport. The complaint and evidence presented in the trial court created a question of fact concerning whether defendants, who, we may infer, had knowledge and experience concerning the sport of horse jumping superior to that of plaintiff, negligently deployed the jumps at unsafe heights or intervals and thereby breached the duty owed to plaintiff." (*Id.* at pp. 822–823.)

Three years later, in a case involving alleged instructor liability for a judo student's injury, the court in *Bushnell v. Japanese-American Religious & Cultural Center* (1996) 43 Cal.App.4th 525 [50 Cal.Rptr.2d 671] (*Bushnell*), offered an explanation of *Tan* and *Galardi*. In *Bushnell*, the plaintiff, Gary Bushnell, was injured while performing a judo maneuver during practice with his instructor. He sued his instructor's club. Summary judgment was granted for the club based upon *Knight*. (*Bushnell, supra*, at p. 528.) The Court of Appeal affirmed, holding that the *Knight* standard applied in the student-instructor context. The court explained: "That an instructor might ask a student to do more than the student can manage is an inherent risk of the activity. Absent evidence of recklessness, or other risk-increasing conduct, liability should not be imposed simply because an instructor asked the student to take action beyond what, with hindsight, is found to have been the student's abilities. To hold otherwise would discourage instructors from requiring students to stretch, and thus to learn, and would have a generally deleterious effect on the sport as a whole." (*Bushnell, supra*, at p. 532.)

In so holding, the *Bushnell* court concluded that the decisions reached in *Tan* and *Galardi* "are wholly compatible with our understanding of the principles enunciated in *Knight* . . . ." (*Bushnell, supra*, 43 Cal.App.4th at p. 532.) Regarding *Tan*, the court stated: "The court in *Tan* held that the riding instructor 'owed Tan a duty of ordinary care to see to it that the horse he assigned Tan to ride was safe to ride under the conditions he prescribed for that activity. His failure to do so is analogous to the example cited in *Knight*, of the duty of the ski resort operator to use due care to maintain its towropes in a safe condition.' [Citation.] The *Tan* court thus simply reaffirmed that the party who controls the activity (such as a ski resort operator or the owner of a baseball stadium) may have a duty of care to provide a safe environment such that the activity can be performed without unnecessary risk. Nothing in *Tan* supports the argument that, absent reckless conduct or an intention to cause injury, an instructor who asks a student to take on a challenge in order to

better his or her skills will be liable for injuries resulting from the student's failure to meet that challenge. *Failing to provide a fit animal and a safe track increased the risk to the plaintiff beyond that inherent in the activity and liability might attach for requiring the plaintiff to take on the increased risk. To look at the situation another way, requiring the defendant to provide a safe horse and track could have no chilling effect on the activity itself, nor would it interfere with the ability of the instructor to teach the student new or better skills.*" (*Bushnell, supra,* at p. 533, italics added.)

The California Supreme Court first considered how *Knight* applied in a student-coach scenario in *Kahn, supra,* 31 Cal.4th 990.[14] In that case, the plaintiff, a high school swimming student, broke her neck when she dove from a starting block into a shallow racing pool. She alleged her injury was caused by the defendant coach's failure to instruct her on how to dive safely into the shallow pool and the coach's insistence that she dive at a swim meet despite her objections, her lack of expertise, her fear of diving, and the coach's promise to exempt her from diving. (*Kahn, supra,* at p. 995.) The *Kahn* court summarized its analysis at the outset: "[W]e recognize that the relationship of a sports instructor or coach to a student or athlete is different from the relationship between coparticipants in a sport. But because a significant part of an instructor's or coach's role is to challenge or 'push' a student or athlete to advance in his or her skill level and to undertake more difficult tasks, and because the fulfillment of such a role could be improperly chilled by too stringent a standard of potential legal liability, we conclude that the same general standard should apply in cases in which an instructor's alleged liability rests primarily on a claim that he or she challenged the player to perform beyond his or her capacity or failed to provide adequate instruction or supervision before directing or permitting a student to perform a particular maneuver that has resulted in injury to the student. A sports instructor may be found to have breached a duty of care to a student or athlete only if the instructor intentionally injures the student or engages in conduct that is reckless in the sense that it is 'totally outside the range of the ordinary activity' [citation] involved in teaching or coaching the sport." (*Id.* at p. 996.)

Applying this standard to its facts, the *Kahn* court held that summary judgment was improper. "[T]he following factors indicated a triable issue with respect to whether the coach's behavior was reckless: the lack of

---

[14] In 1997, the Supreme Court in *Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456 [63 Cal.Rptr.2d 291, 936 P.2d 70] cited *Tan* and *Galardi,* among other cases, for the proposition that "a coach or sport instructor owes a duty to a student not to increase the risks inherent in the learning process undertaken by the student." (*Parsons v. Crown Disposal Co., supra,* at p. 482.) The *Parsons* case, however, did not involve the liability of a coach or instructor for the injuries suffered by a student, and its statement on that issue was therefore dictum.

training in the shallow-water dive disclosed by plaintiff's evidence, especially in the face of the sequenced training recommended in the Red Cross manual submitted by plaintiff; the coach's awareness of plaintiff's deep-seated fear of such diving; his conduct in lulling her into a false sense of security through a promise that she would not be required to dive, thereby eliminating any motivation on her part to learn to dive safely; his last-minute breach of that promise under the pressure of a competitive meet; and his threat to remove her from the team or at least the meet if she refused to dive." (*Kahn, supra,* 31 Cal.4th at p. 1012.)

In the course of its analysis, the court discussed *Bushnell,* including its treatment of *Tan* and *Galardi.* (*Kahn, supra,* 31 Cal.4th at pp. 1006–1008.) *Tan* and *Galardi,* the *Kahn* court stated, "could be explained on the ground that the instructors' conduct arguably *was* reckless, in the view of the *Bushnell* court, but were unsupportable to the extent they suggested that liability would follow when a coach or instructor merely urged the student to follow a desirable sequence of training and execute a maneuver that turned out to be beyond the student's capacity." (*Kahn, supra,* at pp. 1007–1008; see also *Kane v. National Ski Patrol System, Inc.* (2001) 88 Cal.App.4th 204, 212 [105 Cal.Rptr.2d 600] [*Tan* and *Galardi* are consistent with *Knight* because "the instructors' conduct was analogous to the example of the defective rope tow discussed in" *Knight*].)

Lastly, in *Wattenbarger v. Cincinnati Reds, Inc.* (1994) 28 Cal.App.4th 746 [33 Cal.Rptr.2d 732], the 17-year-old plaintiff, Jeffrey Wattenbarger, attended a supervised tryout for the Cincinnati Reds. "The last part of the tryout was conducted under conditions simulating an actual game. The pitchers, including plaintiff, each took a turn throwing to several batters. Before his turn, plaintiff threw a number of warmup pitches to get his arm ready. On his third pitch to a batter, plaintiff felt his arm 'pop' but experienced no particular pain. He stepped off the pitcher's mound and informed the Reds' personnel . . . that his arm had popped. Receiving no response, plaintiff returned to the mound and threw another pitch. He immediately experienced severe pain in his arm and quit pitching." (*Id.* at p. 750, fn. omitted.) He suffered a tearing away of bone and tendon due to triceps contraction. (*Id.* at p. 753.) After explaining that an arm injury such as the one suffered by Wattenbarger is a risk inherent in pitching, the court concluded that the Cincinnati Reds owed a duty to Wattenbarger not to increase the risks inherent in the game of baseball. (*Id.* at p. 755.) The court likened this duty to a duty not to increase the risk of injury by supplying "faulty equipment such as batting helmets or catching gear." (*Ibid.*) The court concluded: "[D]efendants owed a duty of care to protect participants from aggravating injuries during the tryout. This would include preexisting injuries known to defendants as well as those occurring during the tryout. Thus, primary assumption of risk is inapplicable.

[¶] Because issues of fact exist as to whether defendants were aware of plaintiff's injury, whether they encouraged or permitted him to throw a fourth pitch, and whether this final pitch caused injury, summary judgment was improperly granted." (*Id.* at p. 756, fn. omitted.)

■ The following principles can be distilled from the above cases: To the extent a duty is alleged against a coach for "pushing" and/or "challenging" a student to improve and advance, the plaintiff must show that the coach intended to cause the student's injury or engaged in reckless conduct—that is, conduct totally outside the range of the ordinary activity involved in teaching or coaching the sport. (*Kahn, supra*, 31 Cal.4th at p. 1011.) Furthermore, a coach has a duty of ordinary care not to increase the risk of injury to a student by encouraging or allowing the student to participate in the sport when he or she is physically unfit to participate or by allowing the student to use unsafe equipment or instruments. (*Tan, supra*, 13 Cal.App.4th at pp. 1535–1536; *Wattenbarger v. Cincinnati Reds, Inc., supra*, 28 Cal.App.4th at p. 755.)[15]

These principles are in line with the underlying policy of not creating a "chilling effect on the activity itself, nor . . . interfer[ing] with the ability of the instructor to teach the student new or better skills." (*Bushnell, supra*, 43 Cal.App.4th at p. 533.) In accordance with *Knight* and *Kahn*, we must be concerned with the possibility that subjecting an equestrian coach to liability will "alter the nature of an active sport or chill vigorous participation in the activity." (*Kahn, supra*, 31 Cal.4th at p. 1011.) If, for example, a coach could be liable for encouraging a student to enter a two star equestrian event when the student was not ready for the challenge, the coach might be reluctant to push the student to that next level of skill. As we understand the Erikssons' complaint, however, this is not the basis for their claim. Rather, they are

---

[15] We agree with the *Bushnell* court's characterization of *Galardi*. As stated: "To the extent that the court found that the defendants *had failed to provide a safe environment* for the plaintiff, we agree that liability might attach because the defendants thereby increased the risk inherent in the activity. If, however, the court found that liability might attach because the defendants were negligent in asking the plaintiff to take on new challenges in order to improve her skills, we do *not* agree that liability might attach, at least in the absence of evidence that the instructor acted recklessly or with an intent to cause injury. In other words, to the extent that a necessary or desirable part of the plaintiff's training was to ask her to take higher and higher jumps or take the jumps in various orders, the defendants should not be held liable simply because they were the plaintiff's instructors and it turned out that the plaintiff, or her horse, could not make the jump. If, however, the alteration in the course was such that it was reckless to ask the plaintiff to run it (i.e., the course was now unsafe), the instructors breached their duty to use due care not to increase the risks over and above those inherent in the sport, and liability should attach. The question, as always, is whether the imposition of liability would chill vigorous participation in the activity." (*Bushnell, supra*, 43 Cal.App.4th at pp. 533–534, first italics added; see also *Allan v. Snow Summit, Inc.* (1996) 51 Cal.App.4th 1358, 1369–1371 [59 Cal.Rptr.2d 813] [Fourth Dist., Div. Two] ["wholly" agreeing with the *Bushnell* court's discussion of *Tan* and *Galardi*].)

asserting that Nunnink increased the risk inherent in the sport by sending Mia out to compete in a difficult cross-country course on a horse that was unfit, and that she concealed from or misrepresented the horse's condition to Karan (whose permission Mia needed to compete). As such, the case is distinguishable from cases such as *Bushnell* and *Kane*, in which instructors were sued, and found not liable, for challenging their students to improve their skills. (See *Bushnell, supra*, 43 Cal.App.4th at p. 534; *Kane v. National Ski Patrol System, Inc., supra*, 88 Cal.App.4th at p. 214.) This case is more analogous to *Tan*, in which the riding coach knowingly assigned an injured horse to the plaintiff to ride on a rocky track. (*Tan, supra*, 13 Cal.App.4th at p. 1535.) There, the defendant had a duty "to see to it that the horse he assigned Tan to ride was safe to ride under the conditions he prescribed for that activity." (*Ibid.*) It is also analogous to *Wattenbarger*, where the plaintiff was allowed to throw a fourth pitch after injuring his arm. Whether this is characterized as "a duty of ordinary care," as the *Tan* court described it, or as a duty not to increase "the risk to the plaintiff beyond that inherent in the activity," as the *Bushnell* court interpreted *Tan*, the duty is the same: Nunnink had a duty not to unreasonably increase the risk inherent in the cross-country event by allowing Mia to ride a horse that was not fit. We see no undesirable chilling effect on the sport of eventing flowing from the imposition of such a duty.

In clarifying the duty Nunnink owed to Mia in light of the foregoing, we begin, as *Knight* and *Kahn* direct, by considering the nature of the activity that Mia was engaged in when she was injured. Here, Mia was competing in an equestrian cross-country event, which requires the horse and rider to jump over fences and other obstacles. The more difficult the jumps, the more challenging the course. There is no dispute in this case that inherent in this activity is the risk of falling off or being thrown by a horse during the competition, causing injury to the rider. These inherent risks highlight the importance of having a healthy and fit horse when engaging in the activity.

Regarding the relationship of the parties to the activity and defendant's role in the activity, the parties dispute whether Nunnink is considered a "coach" or a "trainer." Regardless of how she is characterized, there is substantial evidence that Nunnink's role encompassed the authority and responsibility to determine whether Mia's horse was fit for competition. According to Karan, Nunnink was "completely responsible for the horse" and was required "to make sure the horse was fit and ready to go" before an event. Karan further testified that following Ram Tap Nunnink told her that the horse was very lame and that it needed tack walking and that Nunnink was going to take the horse home with her. Additionally, there was evidence that Nunnink assured Karan that if Kory did not look good, she would "pull him" from the competition. Indeed, in the release Nunnink relies on, she

reserved for herself the authority to refuse to permit Mia to use a horse that is "not in proper health or deemed dangerous or undesirable by [Nunnink]." Lastly, Nunnink testified she would "have said something" if she felt that Mia's horse should not be competing.

The conversations between Nunnink and Karan regarding Mia's participation at Galway also reveal a relationship in which Karan relied on Nunnink's expertise with respect to that decision and Nunnink asserted her authority to make the decision. For example, although Karan believed that Kory was "lame" after the Ram Tap fall and expressed her concerns to Nunnink about Kory's condition, Nunnink repeatedly assured her that Kory was good to go; when Karan persisted, Nunnink finally told her: "I'm the coach, shut up. It's fine. Get out of here."

Clearly there is credible evidence that Nunnink had some responsibility for the fitness of the horse and had the ability to control whether the horse participated in the cross-country event.

Given this background, we now address whether Nunnink met her prima facie burden of production that she owed no duty to Mia based on primary assumption of the risk and that she did not breach that duty.

### C. *Nunnink Failed to Meet Her Initial Burden of Production as It Relates to Duty and Breach of Duty*

A trial court properly grants summary judgment when there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

A moving party defendant is entitled to summary judgment if it establishes a complete defense to the plaintiff's causes of action, or shows that one or more elements of each cause of action cannot be established. (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 849.) A moving party defendant bears the initial burden of production to make a prima facie showing that no triable issue of material fact exists. Once the initial burden of production is met, the burden shifts to the responding party plaintiff to demonstrate the existence of a triable issue of material fact. (*Id.* at pp. 850–851.) From commencement to conclusion, the moving party defendant bears the burden

of persuasion that there is no triable issue of material fact and that the defendant is entitled to judgment as a matter of law. (*Id.* at p. 850.)

On appeal following the grant of summary judgment, we review the record de novo, considering all of the evidence except that to which objections were made and sustained. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 [32 Cal.Rptr.3d 436, 116 P.3d 1123].) "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Ibid.*)

"Our review of the summary judgment motion requires that we apply the same three-step process required of the trial court. [Citation.] 'First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading. [Citations.] [¶] Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor. [Citations.] . . . [¶] . . . [T]he third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue. [Citation.]' [Citation.]" (*Todd v. Dow* (1993) 19 Cal.App.4th 253, 258 [23 Cal.Rptr.2d 490].)

" 'The purpose of a summary judgment proceeding is to permit a party to show that material factual claims *arising from the pleadings* need not be tried because they are not in dispute.' [Citation.] Materiality depends on the issues in the case, and what matters are at issue is determined by the pleadings, the rules of pleadings, and the substantive law. [Citation.] '*The complaint measures the materiality of the facts tendered in a defendant's challenge to the plaintiff's cause of action.*' [Citation.]" (*Teselle v. McLoughlin* (2009) 173 Cal.App.4th 156, 172 [92 Cal.Rptr.3d 696], italics added.)

Here, as part of their allegations relative to Nunnink's "duty of care," the Erikssons alleged: "[Nunnink] . . . coached, supervised, and provided services for the event which substantially increased the risk reasonably assumed by [Mia] because, among other things, . . . the horse that [Mia] rode was unfit to ride because of prior falls and lack of practice and this unfit condition was concealed from [the Erikssons]; all of which combined to be a substantial factor . . . in the happening of [Mia's] injury and death and which substantially increased the risks to [Mia] in her participation in the equestrian event."

To be entitled to summary judgment as it relates to the element of duty of care, Nunnink therefore had to negate the above "material factual allegation." (See *Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1534–1535 [80 Cal.Rptr.2d 94] [the burden rests with the defendant to affirmatively negate the existence of a duty].)[16]

■ To negate this material factual allegation as it pertains to duty, Nunnink must set forth those material facts which would entitle her to judgment as a matter of law. As explained in *Teselle*, this is accomplished through the undisputed statement of material facts. "The purpose [of summary judgment] is carried out in [Code of Civil Procedure] section 437c, subdivision (b)(1) by requiring the moving party to include in the moving papers 'a separate statement setting forth plainly and concisely all material facts which the moving party contends are undisputed . . . [together with] a reference to the supporting evidence.' 'The complaint measures the materiality of the facts tendered in a defendant's challenge to the plaintiff's cause of action' [citation], *hence the moving party's separate statement must address the material facts set forth in the complaint*." (*Teselle v. McLoughlin, supra*, 173 Cal.App.4th at p. 168, italics added.) As set forth in *United Community Church v. Garcin* (1991) 231 Cal.App.3d 327, 335 [282 Cal.Rptr. 368], the purpose of the separate statement is "to afford due process to opposing parties . . . ." " 'Where a remedy as drastic as summary judgment is involved, due process requires a party be fully advised of the issues to be addressed and be given adequate notice of what facts it must rebut in order to prevail.' " (*San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 316 [125 Cal.Rptr.2d 499].)

Under the present facts, it was incumbent on Nunnink to set forth in her separate statement of undisputed facts a clear statement negating the element of duty. This could be done in two ways. Nunnink could have set forth an undisputed fact that established (1) she had no control over or responsibility as to whether Mia and Kory participated in the cross-country portion of the Galway competition, or (2) Kory was not unfit for that competition. As we explain below, she did neither; as a result, she failed to negate the Erikssons' material allegation as it relates to duty of care.

In Nunnink's separate statement of undisputed facts, there is no undisputed fact negating Nunnink's control or responsibility as to whether Mia and Kory participated in the cross-country event. In regard to the unfitness of the horse,

---

[16] At oral argument before the trial court, defense counsel clearly understood and articulated that the factual allegation relative to the fitness of the horse was the critical issue. We believe the error in his argument, however, is that he placed the burden on the Erikssons to establish duty rather than acknowledging that it was Nunnink's obligation to affirmatively negate the existence of a duty.

the undisputed fact that comes closest to addressing the issue is undisputed fact No. 13, which states: "At no time before Mia Eriksson began her cross-country course run did anyone, including Mia Eriksson, ever complain that her horse was not behaving characteristically or in a manner that would suggest that Kory would present a danger to Mia Eriksson were she to ride that horse in the eventing competition, and she received a very good score of 50 in the dressage portion of the competition, on the previous day . . . ."

The import of this "undisputed fact" is that no one *complained* to Nunnink that the horse was unfit for the competition. It does not say that the horse was fit for the event or that she did not allow Mia to ride an unfit horse in the event. Thus, it does not address the issue of duty and primary assumption of the risk. Nor does it directly address whether she breached this duty of ordinary care. Under our facts, to establish that she did not breach her duty of care, she must establish that she did not know or should not have reasonably known that the horse was unfit. The distinction between "no one complained to her" and "I did not know nor should I have reasonably known" is significant. The Erikssons could very well admit that no one complained to Nunnink about the fitness of the horse, yet Nunnink, based on her own expertise, could still have known or had reason to know that the horse was unfit. Thus, the "undisputed fact," as phrased, does not put the issue to rest.

■ Summary judgment is a "drastic remedy." (*Mateel Environmental Justice Foundation v. Edmund A. Gray Co.* (2003) 115 Cal.App.4th 8, 17 [9 Cal.Rptr.3d 486].) As stated in *Anderson v. Metalclad Insulation Corp.* (1999) 72 Cal.App.4th 284, 289–290 [85 Cal.Rptr.2d 331]: "The defendant must demonstrate that under *no hypothesis* is there a material factual issue requiring trial. [Citation.] If the defendant does not meet this burden, the motion must be denied." (Italics added.) Within the context of summary judgments, lawyers can place great care into the drafting of authorities, separate statement of undisputed facts, and declarations proffered in support thereof. Words mean something; what is stated or not stated has significance. Nunnink failed in her statement of undisputed facts to lay to rest the Erikssons' allegation that the horse was unfit or that Nunnink knew or should have known of the unfitness. Because of this, Nunnink did not meet her burden to demonstrate that, as a matter of law, there were no triable issues of fact relative to her duty of care and breach of duty.

D. *Regardless of the Deficiencies in Nunnink's Separate Statement of Undisputed Facts, Triable Issues Exist as to Duty and Breach of Duty*

In her arguments on appeal, Nunnink relies on evidence that is not encompassed by her separate statement of undisputed facts. However, even if

we look beyond the separate statement and consider the additional evidence discussed in the briefs, the evidence submitted reveals triable issues of material fact relative to duty and breach of duty.

As previously discussed, there is evidence of Nunnink's responsibility for determining Kory's fitness for competition, as well as her control over whether Mia and Kory participated in cross-country jumping.

On appeal, in support of the proposition that Kory was not unfit to compete, Nunnink relies heavily on evidence of the Ram Tap veterinarian report and the rules applicable at Galway that the horses undergo two inspections. Based upon this evidence, she asserts that Kory was "cleared by three veterinarians." This overstates the evidence. The Ram Tap veterinarian noted that Kory suffered a concussion and other injuries. She prescribed medication for Kory, advised the Erikssons to monitor Kory closely for head trauma, and instructed them to have a followup with their regular veterinarian. There is no evidence that the followup visit occurred. Nunnink's assertion that the veterinarian "cleared" Kory for the Galway competition appears to be based on the following note in the Ram Tap veterinarian's report: "Next show 2 wks." This note immediately precedes the instructions, "Monitor close for signs of head trauma" and "Follow up w/Regular Vet." Viewing the report in its entirety, the reference to the next show in two weeks cannot reasonably be construed as clearing Kory for competition.

The second veterinarian check relied upon by Nunnink was purportedly performed upon Kory's arrival at Galway. According to the rules applicable at Galway, this check is merely "to establish first each horse's identity and veterinary history (vaccination, etc.) and second, each horse's state of health (*but not its soundness*)." (Italics added.) As a Galway official testified, this check is to make sure that "the horse is not sick and going to infect the other horses . . . ." There is no direct evidence in the record that this check on Kory's health actually occurred. Even if we infer from the existence of the rule and the fact that Kory was permitted to compete that the check took place, there is no evidence that the veterinarian went beyond the duties specified in the rules and checked on Kory's "soundness" for competition.

The third veterinarian check relied on by Nunnink is the "First Horse Inspection" that occurred prior to dressage. As explained above, each horse is trotted out by the rider prior to dressage in front of a committee comprised of the event's ground jury and a veterinarian. Under the rules, the "committee has the right and the duty to eliminate from the competition any horse that they judge is unfit, whether on account of lameness, lack of condition or for any other reason." Although our record includes the rules requiring this

inspection, there is no evidence submitted by any of the parties that this inspection actually occurred and included the required veterinarian. If we infer that it took place, it appears that the "inspection" involves only a visual observation of the horse from a distance, not a medical examination. Moreover, there is no evidence that a veterinarian on the committee who supposedly observed Kory knew about Kory's recent fall or that the veterinarian did anything to determine whether Kory was fit to compete in the cross-country event.

When the evidence and the circumstances surrounding the three veterinarians are examined, they provide only weak evidence that *any* veterinarian, let alone three, actually considered Kory's fitness to compete in the cross-country event in light of his recent fall and injury.

Nunnink also relies upon a statement in her declaration that she was familiar with Kory and, in November 2006, "recognized that horse as capable of successfully competing in the Galway Downs 3-day Event . . . ." This statement, like the statement regarding the absence of complaints about Kory's behavior discussed above, does not directly address Kory's fitness for the cross-country event. Even an injured, unfit horse may be capable of successfully competing; and yet, sending a rider out on such a horse will nevertheless increase the risk of injury inherent in the sport.

Reviewing the record as a whole, the evidence, viewed favorably to the Erikssons, reveals the following: Nunnink has been a professional trainer of horse riders for equestrian competitions for 25 years. In September 2006, Mia competed in an event at Twin Rivers. There, according to Karan, "Kory rapped a fence really severely," resulting in a "big bruise." After Twin Rivers, according to Karan, Nunnink was worried about the cross-country course at Galway and "didn't like how Kory was going." After receiving a bruise at Twin Rivers, Nunnink was worried about Kory and believed the horse needed some more experience, or "mileage," prior to the Galway event; Mia therefore entered the Ram Tap competition. On the second day at Ram Tap, Kory tripped on a hay bale during the cross-country course and fell to his knees, causing the horse's head and nose to hit the ground. A veterinarian examined Kory and found that the horse suffered a concussion, an abrasion on his forehead, swelling and a hematoma on the pectoral area, a minor contusion in the chest, and small abrasions on his pectoral region. The veterinarian prescribed bute (phenylbutazone) and antibiotics to reduce inflammation and recommended the use of ice to reduce swelling. Kory was withdrawn from the remainder of the Ram Tap competition. The veterinarian prescribed additional medicine, stated that the horse should be closely monitored for signs of head trauma, and instructed the Erikssons to follow up

with their regular veterinarian. Kory remained on the medications up to the time of Galway. Kory did not practice any jumps during the week after Ram Tap. Based upon the "trouble" Kory experienced at Ram Tap, Karan believed that Kory was a "lame" horse and that Mia's eventing season was over. She was told by Nunnink that the horse was very lame after Ram Tap. She was further told that the horse needed tack walking and that Nunnink was going to take him home with her. Kory's injuries had not fully healed and caused him agitation during the cross-country run. Kory was not fit or prepared to run the cross-country course. This last point is based in part on the video evidence of the Ram Tap incident and Mia's last ride. The Ram Tap video depicts a significant fall involving the entire front portion of Kory's body. And, in viewing the Galway video, even aside from the trip at fence 19 that took Mia's life, Kory appears to be having great difficulty maneuvering a number of jumps. As Nunnink admitted, it is obvious from early on in the run that "things were not going well." All told, there is sufficient evidence to create a triable issue of fact as to whether, on the day of the incident, Kory was fit to undertake the cross-country course, whether Nunnink allowed or encouraged Mia to ride, and whether Nunnink knew or should have known of Kory's unfitness.

### E. Triable Issues Exist as to Causation

As explained earlier, due process dictates that we limit review to the facts set forth in Nunnink's separate statement of undisputed facts. Here, Nunnink posited no undisputed fact relative to the issue of causation. The closest statement is undisputed fact No. 22, wherein Nunnink sets forth: "[Mia's] own athletic, recreational and sporting activity of competitive equestrian riding brought her to incur fatal injuries on November 4, 2006." Assuming that this is sufficient to cover the area of "legal causation," there clearly exists a triable issue as to whether the fitness of the horse was a contributing factor to Mia's failure to clear fence 19.[17]

### F. Express Written Release

As an additional ground for summary judgment, Nunnink contends the Erikssons' claims are barred by the "RELEASE OF LIABILITY" signed by

---

[17] Relative to the present motion, the record contains facts supportive of the allegation that Nunnink misrepresented certain facts to Karan as to the fitness of the horse. These facts will be discussed more fully as relates to their impact on the validity and enforceability of the release. These same facts are also relevant to whether triable issues of fact exist as to duty and breach of duty. While, under our facts, we believe liability may be imposed upon a determination that Nunnink negligently increased the risk of harm by allowing Mia to ride an unfit horse, facts as to the affirmative misrepresentations create triable issues as to whether her culpability rises to the level of recklessness. On the issue of causation, they are also relevant in determining whether Karan would have pulled Mia out of the event save and except for the facts misrepresented by Nunnink.

Mia and Karan in May 2006. As noted above, the trial court did not base its ruling on this ground. Because we hold that summary judgment was improper based on the issue of duty, breach, or causation, we must address the effect of the release.

The release agreement provides, in relevant part:

"This RELEASE OF LIABILITY is made and entered into . . . by and between KRISTI NUNNINK, hereinafter designated 'Trainer'; and the below signed, hereinafter designated, 'Rider.'

"In return for the use today, and on all future dates, of the property, facilities and services provided by Trainer, the Rider, their heirs, assigns and legal representatives, her[e]by expressly agree to the following: [¶] . . . [¶]

"2. RIDER AGREES TO ASSUME ANY AND ALL RISKS INVOLVED IN OR ARISING FROM RIDER[']S USE OF OR PRESENCE AT TRAIN-ER[']S FACILITIES, including, without limitation, but not limited to, the risks of death; bodily injury; property damage; falls; kicks; bites; collisions with vehicles, horses or stationary objects; fire or explosion; the unavailability of emergency medical care; or the negligence or deliberate act of another person or animal.

"3. Rider agrees to hold Trainer . . . completely harmless and not liable and release [Trainer] from all liability whatsoever, and AGREES NOT TO SUE them on account of or in connection with any claims, causes of action, injuries, damages, costs or expenses arising out of Rider's use of Trainer's services or facilities or presence upon any property used, including without limitation, those based on death, bodily injury, . . . except if the damages are caused by the direct, willful and wanton negligence of the Trainer. [¶] . . . [¶]

"5. Rider agrees to indemnify Trainer against, and hold her harmless from, any and all claims, causes of action, damages, judgments, costs or expenses including attorney's fees, which in any way arise from Rider's use of Trainer[']s services or presence upon Trainer's facilities or property used by or with Trainer.

"6. Rider agrees to abide by all of Trainer's rules, regulations and instructions.

"7. If Rider is using their own horse, the horse shall be in good condition and free from infection, contagious or transmissible disease. Trainer reserves

the right to refuse the presence or use of any horse if not in proper health or deemed dangerous or undesirable by Trainer.

"8. Rider will be allowed to ride horses provided by Trainer. Rider is or will make their self aware of the characteristics of any horse to be ridden, and voluntarily assumes all risk from riding any horse.

"9. When the Trainer, Rider and (if minor) Rider's parent sign this Release, it will then be irrevocable and binding on all parties, subject to the above terms and conditions."

The document is signed by Nunnink as "Trainer," by Mia as "Rider," and by Karan as "Rider's Parent."

On appeal, the parties focus their arguments on issues concerning the ambiguity or lack thereof of the release agreement. For the reasons that follow, we conclude that, even if the release is unambiguous and enforceable as to a claim of ordinary negligence, it does not preclude the Erikssons' actions against Nunnink to the extent they are based upon aggravated misconduct by Nunnink.

In *City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 754 [62 Cal.Rptr.3d 527, 161 P.3d 1095] (*Santa Barbara*), the court considered whether a release agreement that purported to release the City of Santa Barbara and others (the releasees) from any loss " 'caused by any negligent act or omission of the releasees or otherwise' " precluded liability arising from the city's gross negligence. (*Id.* at pp. 750–752 & fn. 3.) The court explained that "future . . . liability for 'ordinary' or 'simple' negligence generally may be released . . . ." (*Id.* at p. 758.) Such releases have been frequently upheld in the context of sports and recreation programs. (*Id.* at p. 759; see, e.g., *Benedek v. PLC Santa Monica* (2002) 104 Cal.App.4th 1351, 1356–1357 [129 Cal.Rptr.2d 197].) However, "an agreement made in the context of sports or recreational programs or services, purporting to release liability for future gross negligence, generally is unenforceable as a matter of public policy." (*Santa Barbara, supra*, at p. 751.)

The principal rationale for refusing to enforce releases of liability for future gross negligence is that public policy should " 'discourage' (or at least not facilitate) 'aggravated wrongs.' " (*Santa Barbara, supra*, 41 Cal.4th at p. 762; see also *id.* at p. 776.) Thus, the Supreme Court approved of the rule adopted in a majority of states that "an agreement that would remove a party's obligation to adhere to even a minimal standard of care, thereby sheltering

aggravated misconduct, is unenforceable as against public policy." (*Id.* at p. 762; see also *id.* at p. 777, fn. 54; *Allan v. Snow Summit, Inc., supra,* 51 Cal.App.4th at p. 1372.)

■ Again, we address Nunnink's separate statement of undisputed facts for purposes of determining whether she met her initial burden of production. While our record does not contain a copy of Nunnink's answer, we assume she asserted the existence of the "RELEASE" as an affirmative defense. (*Baker v. Ferrel* (1947) 78 Cal.App.2d 578, 579 [177 P.2d 973] ["a release is an affirmative defense which must be specially pleaded"].)

■ In *Bacon v. Southern Cal. Edison Co.* (1997) 53 Cal.App.4th 854, 858 [62 Cal.Rptr.2d 16], the court, in discussing the defendant's burden of proof at summary judgment relative to an affirmative defense, stated: "If the moving defendant argues that it has a complete defense to the plaintiff's cause of action, the defendant has the initial burden to show that undisputed facts support each element of the affirmative defense. Once it does so, the burden shifts to plaintiff to show an issue of fact concerning at least one element of the defense. [Citation.] If, in anticipation of an affirmative defense, the complaint alleges facts to refute it, the pleadings themselves create 'a material issue which defendant[] would have . . . to refute in order to obtain summary [judgment].' [Citation.]" With respect to the issue of whether a release is valid as to gross negligence, the court in *Santa Barbara* stated: "Our holding simply imposes a limitation on the defense that is provided by a release. A plaintiff is not required to anticipate such a defense [citation]; instead, the defendant bears the burden of raising the defense and establishing the validity of a release *as applied to the case at hand.*" (*Santa Barbara, supra,* 41 Cal.4th at p. 780, fn. 58, italics added.)

Here, the Erikssons' complaint set forth the material factual allegation that Nunnink unreasonably increased the inherent risk of injury in horse jumping by allowing Mia to ride an unfit horse. The Erikssons further alleged that Nunnink concealed the horse's unfitness from Karan.[18] Whether pled in anticipation of Nunnink's assertion of the defense of the release, as discussed in *Bacon*, or simply as facts of the case at hand, as in *Santa Barbara*, it was incumbent upon Nunnink, as part of her burden of production, to submit undisputed facts negating these material factual allegations, which could well equate to gross negligence. This she did not do.[19]

---

[18] Here, as in *Santa Barbara*, there was no cause of action alleging "gross negligence" against Nunnink. As indicated in *Saenz v. Whitewater Voyages, Inc.* (1990) 226 Cal.App.3d 758, 766, footnote 9 [276 Cal.Rptr. 672]: "In reality, California does not recognize a distinct cause of action for 'gross negligence' independent of a statutory basis."

[19] Other than an undisputed fact that Nunnink did not "own, possess, or control the premises" on which the incident occurred, the only undisputed fact directed toward the release

"Gross negligence," as defined in *Santa Barbara*, means either a want of even scant care or an extreme departure from the ordinary standard of conduct. (*Santa Barbara, supra*, 41 Cal.4th at p. 754.) It "connotes such a lack of care as may be presumed to indicate a passive and indifferent attitude toward results . . . ." (*Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714, 729 [80 Cal.Rptr.2d 506, 968 P.2d 65].)

Here, Nunnink was an experienced eventing coach. She was fully aware of all the incidents involving Kory and the injuries he received. Thus, as earlier stated, triable issues exist as to the reasonableness of her conduct in allowing Mia and Kory to participate in the cross-country portion of the Galway event. Placing the disputed facts as to the unfitness of Kory in conjunction with disputed facts as to Nunnink's knowledge and the representations she made to Karan, triable issues exist as to the presence of gross negligence. Viewing the evidence in the light most favorable to the Erikssons, Nunnink knew or should have known that Kory was unfit to jump. And, in spite of this knowledge, she affirmatively misrepresented facts relative to the condition of Kory that led to Mia's participation in the cross-country event.[20] Evidence from the record, again in the light most favorable to the Erikssons, shows that Nunnink told Karan that they were "just going to throw the horse in the trailer so that it [could] get walked [at Galway]." After Nunnink arrived at Galway, she called Karan and said that Kory was "going smoothly" and they were "just going to ride dressage." The next day, Nunnink told Karan that Mia did really well in dressage, with a score of 50. She further indicated that Kory had been jumping all week and was good to go. On the day of the cross-country jumping, Karan spoke to Nunnink twice, once in a barn and later in the warmup ring. At the barn, Nunnink told Karan not to worry, that Kory was "fine, he's great, you know, he's good." She also assured Karan that if Kory did not look good, she would "pull him" from the competition.

Given all of these facts, triable issues exist as to whether Nunnink's conduct was grossly negligent and therefore outside the scope of the release.

was undisputed fact No. 20, wherein the following is stated: "Over five months before the November 4, 2006 date of Mia Eriksson's subject accident and her riding in the Galway Downs 3-day eventing competition, on May 21, 2006 Mia and her mother, *viz.*, plaintiff KARAN [ERIKKSON], signed a clear, 'RELEASE OF LIABILITY' for any injuries or death that might occur to Mia Eriksson as a result of the 'use of Trainer [Kristi Nunnink]'s services' that would include the Galway Downs 3-day Eventing competition, on behalf of Mia Eriksson, since she was still 17 years old and a minor, noting that they expressly assumed the risk of any such injuries or death." Clearly, this undisputed fact is directed solely to the existence of the release. It does not address the issue of whether Nunnink's conduct was grossly negligent.

[20] See *Kahn, supra*, 31 Cal.4th at page 998, wherein the plaintiff alleged that the defendant broke his promise to her that she would not have to dive at swim meets.

## V. DISPOSITION

The judgment is reversed. The Erikssons shall recover their costs on appeal.

McKinster, Acting P. J., and Miller, J., concurred.

A petition for a rehearing was denied February 3, 2011, and respondent's petition for review by the Supreme Court was denied March 30, 2011, S190803.