Filed 1/27/15

CERTIFIED FOR PARTIAL PUBLICATION[*]

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| KARAN ERIKSSON et al., | |
|     Plaintiffs and Appellants, | E057158 |
| v. | (Super.Ct.No. RIC498680) |
| KRISTI NUNNINK, | O P I N I O N |
|     Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County. Craig Riemer, Judge. Affirmed.

Butler & Dodge and Terrence L. Butler for Plaintiffs and Appellants.

Soltman, Levitt, Flaherty & Wattles and Garth M. Drozin for Defendant and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.C.

# I. INTRODUCTION

In 2006, Mia Eriksson was a 17-year-old equestrian eventing competitor and the daughter of plaintiffs and appellants, Karan and Stan Eriksson.[1] Defendant and respondent, Kristi Nunnink, was Mia's riding coach. In November 2006, Mia's horse struck a hurdle during the cross-country portion of an event at Galway Downs in Temecula. With the Erikssons looking on, Mia fell off her horse and the horse fell on Mia, causing her death.

The Erikssons sued Nunnink for wrongful death and negligent infliction of emotional distress (NIED). The Erikssons alleged that Nunnink substantially increased the risk Mia reasonably assumed by, among other actions, allowing Mia to ride a horse that "was unfit to ride because of prior falls and lack of practice" and concealing this condition from the Erikssons.

In an earlier appeal, we reversed an order granting summary judgment for Nunnink. (See *Eriksson v. Nunnink* (2011) 191 Cal.App.4th 826 (*Eriksson I*).) The case was thereafter tried to the court. After the presentation of the Erikssons' case-in-chief, the court granted Nunnink's motion for entry of judgment pursuant to Code of Civil Procedure section 631.8.[2] The court relied, in part, on a release of liability entered into

---

[1] For ease of reference and to avoid confusion, we will refer to plaintiffs by their first names or collectively as the Erikssons, and we will refer to Mia Eriksson as Mia.

[2] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

2

between Nunnink and Mia about six months prior to Mia's death. The Erikssons appealed.

The Erikssons contend that the release of liability is ambiguous and does not apply to their claims and that, based on the evidence presented and the applicable law, the court erred in granting Nunnink's motion for entry of judgment. In the published portion of our opinion, we hold the release is enforceable and can be asserted by Nunnink as a defense to the Erikssons' wrongful death and NIED claims and Nunnink can therefore be liable only if Mia's death was caused by Nunnink's gross negligence. In the unpublished portion, we conclude that the Erikssons failed to establish that Nunnink was grossly negligent. We therefore affirm the judgment.

## II. SUMMARY OF FACTS

A. *Background*

Eventing is an equestrian sport in which horse and rider compete in three events over three days. The dressage event takes place on the first day,[3] cross-country on the second day, and show jumping on the third. The competitive eventing season runs from late January through November.

Different eventing organizations use different nomenclature for a competition's level of difficulty. International, or FEI, competitions are classified as one-star, two-star, three-star, or four-star. National competitions under the auspices of the United States

---

[3] Dressage is "the art or method of training a horse in obedience and in precision of movement." (Webster's Encyclopedic Unabridged Dict. (1996) p. 596.)

Equestrian Federation (USEF) include "novice," "training," "preliminary," "intermediate," and "advanced" levels. A two-star cross-country event is longer and, according to Nunnink and Karan, more challenging than a USEF intermediate competition.[4] The Galway Downs competition where Mia died was a two-star competition.

In a two-star event, the cross-country jumping course is approximately 4,800 meters long and involves jumps over numerous fences and other obstacles. In contrast to the fences used in the show jumping event, the fences on the cross-country course do not give way or fall down when struck by a horse.

Nunnink is a professional rider and eventing coach who has coached about 80 riders over 25 years. Nunnink said that her job as a coach is to "coach riders to ride their horses better." She explained that her students would not necessarily advance to a higher level merely by competing in a certain number of events. In fact, she would discourage her students from advancing before mastering their current level.

The Erikssons hired Nunnink to be Mia's eventing coach in 2001. In 2005 and 2006, Nunnink had two or three coaching sessions with Mia each week. The sessions took place at the Erikssons' Tahoe Meadows horse ranch in the Truckee area.

In May 2006, Mia and Nunnink entered into a release of liability agreement in which Mia agreed to release Nunnink from all liability except for damages caused by

---

[4] According to an expert witness for the Erikssons, the difference between an international two-star event and a USEF intermediate competition is "not very big."

Nunnink's "direct, willful and wanton negligence."  (This release is discussed in more detail below.)

In planning for the eventing season, Nunnink and Mia would identify particular events they wanted to enter.  The final decision would be made jointly by Nunnink, Karan, and Mia.[5]  If Mia had difficulty at a given level of competition, Nunnink would make the decision to have Mia "step back" to a lower level to be safe.

Mia aspired to be an Olympic rider.  In early 2006, she told Nunnink of her goal to raise her level of competition by moving up through one-star and intermediate competitions to a two-star event.  Nunnink thought Mia could make that progression.

In 2006, Mia competed in eight 3-day events prior to the Galway Downs event.  The only horse Mia rode that year was Koryography, or Kory.  Nunnink described Kory as talented and an "upper-level horse."

Mia's last four competitions prior to Galway Downs were (1) Rebecca Farms in July, (2) Woodside in August, (3) Twin Rivers in September, and (4) Ram Tap in October.  All four competitions were rated intermediate.  Prior to these events, Mia had never competed at that level.  The Galway Downs competition would be Mia's and Kory's first two-star event.

---

[5]  Stan attended most of Mia's competitions, but testified that he was uninvolved and "out of the loop" with respect to communication and decisions about Mia's equestrian activities.  He described himself as "the truck driver" for Mia's events and "the support man."

According to Nunnink, Mia had "rough" rides at the Rebecca Farms and Woodside competitions in that Kory struck his knees on various jumps. At Twin Rivers in September, Kory "hook[ed] the stifle" during the cross-country event. Nunnink explained that hooking a stifle occurs when the horse hits the uppermost portion of the rear legs against a fence during a jump. The incident caused swelling in the area of the injury. The Twin Rivers veterinarian indicated that Kory had a bruise and said they should put ice on it. The veterinarian said that if Kory "trotted sound" in the morning he could show jump. Kory received no further medical attention at that time. The next day, Kory performed in the show-jumping event and, according to Nunnink, was "fine." He did not receive any medication for the Twin Rivers injury.

After Twin Rivers, Nunnink told Karan she wanted Mia to compete at Ram Tap, which was not on the original schedule. Karan agreed.

B. *Ram Tap*

The Ram Tap competition took place on October 20 through 22, 2006. During the cross-country event on the second day, Kory tripped and fell near the 18th jump. A Ram Tap event veterinarian, Dr. Liz Bracken, examined Kory. Dr. Bracken indicated that Kory had swelling and a hematoma on his chest and had suffered a concussion. She said they needed to watch him carefully. Kory was given Bute, an anti-inflammatory, and other medications.

According to Karan, the evening after Kory's Ram Tap fall, she told Nunnink, "We're done," meaning that Mia's eventing season was finished. Nunnink did not argue,

6

but told Karan she wanted Kory to jump a few fences the next morning so that Kory does not "end on a fall."

Dr. Bracken saw Kory again the next day. Nunnink was present during the examination. After the examination, Dr. Bracken indicated that Kory could do a few jumps that afternoon. Karan told Nunnink they could do these jumps, but they were then "done for the season."[6]

Nunnink testified that Kory then performed about 30 jumps, including a jump over the fence where Kory fell, and had no problem with any of them. Karan, however, testified that Kory performed about six "entry-level" jumps, and looked "rough."

After Kory returned to Tahoe Meadows, Karan cut back on Kory's "high-powered feed" and replaced his competition horseshoes with "regular" shoes.

On October 25 or 26, Mia informed Nunnink that she and her parents had a family meeting and agreed that Mia could compete at Galway Downs. Karan, however, testified that she agreed to allow Mia and Kory go to Galway Downs to compete in the dressage event only.

Nunnink called a veterinarian to ask about the hematoma on Kory's chest, but Kory was not seen by a veterinarian. He was given medication through Friday, October

---

[6] When Nunnink was asked at trial about being told that Mia was done for the season, Nunnink testified that Karan asked her to tell Mia that Mia would not be able to compete at Galway Downs; in response, Nunnink told Karan that that was not her job, and if Karan did not want Mia to compete, Karan should tell her. Karan denied this.

27. Nunnink did not see any swelling or discharge from Kory's head injury. To Nunnink, Kory "seemed perfectly healthy."

Kory and Mia had an eventing lesson on October 29 and, in Nunnink's opinion, Kory jumped very well.

On October 29, Nunnink trailered Kory to her facility in Auburn, where Kory stayed for the next two nights. During that time, Kory was not being administered any medications.

On October 30, Mia and Kory performed jumps to prepare for Galway Downs. Nunnink thought the lesson went well. She testified that Karan observed the jumping session; Karan said she did not.

C. *Galway Downs*

Galway Downs was, like other eventing competitions, a three-day event with dressage on Friday, cross-country jumping on Saturday, and show jumping on Sunday. The competition was scheduled for November 3 through 5, 2006.

Mia met the eligibility requirements to compete at Galway Downs based upon her results in prior competitions. Her entry form for the event, submitted after the Woodside event in August, included Karan's written consent. According to a Galway Downs official, Karan could have withdrawn her consent to Mia's participation in the event in person, over the telephone, or in an e-mail.

On October 31, 2006, Mia and a friend trailered their horses to Galway Downs. It was Nunnink's understanding that Mia intended to compete. Nunnink arrived on

8

November 2 and gave Mia a dressage lesson that afternoon. Stan drove to Galway Downs on November 2. Karan, believing that Mia would only compete in dressage, had decided not to travel to Galway Downs.

Prior to the start of the Galway Downs event, the horses undergo an in-barn inspection, where they are checked by a veterinarian, and participate in a "trot out." Dr. Karen Nyrop was the veterinarian who conducted the Galway Downs in-barn inspection. She testified at trial that she noticed a bruise on Kory's chest and was aware that he had hit a fence at Ram Tap. The bruise was not inflamed and Kory showed no pain when Dr. Nyrop pressed on the bruise. She found nothing that required further treatment.

At the trot out, the horses are led by hand before a ground jury of two judges and a veterinarian. This is done to ensure that the horse is sound and not showing any signs of lameness. By rule, a horse may not compete if it is judged "'unfit, whether on account of lameness, lack of condition, or for any other reason.'"

Dr. Nyrop was also on the committee judging the Galway Downs trot out on November 2. She explained that being fit to compete does not require an absolutely perfect horse; the horse can be fit to compete so long as it "is not significantly limping." She testified that she did not observe any significant lameness during Kory's trot out.

Wayne Quarles, the president of the ground jury, also observed the trot out. He testified that Kory passed the trot out without any dissent among the observers. Prior to testifying at trial, he viewed a videotape of Kory's Galway Downs trot out; he saw no signs of lameness in Kory and heard no sound of unevenness in his gait.

9

On November 3, Mia and Kory performed in the dressage competition. In addition to judging the performance, dressage judges are expected to look for signs of lameness and unfitness. Quarles was one of the judges for Mia's dressage event. He saw nothing to suggest that Kory was lame or otherwise unfit to compete.

Nunnink and Stan watched Mia's dressage performance. Out of 45 dressage competitors, Mia placed 41st. Nunnink thought Mia performed well and told Mia she did a very good job riding Kory through a difficult task. It appeared to Stan that Mia was "struggling" and "having problems," and he believed she made "many, many faults and many mistakes." He could not assess whether Kory was having problems.

After the dressage event, Karan spoke with Mia by telephone. Mia indicated that they were going to participate in the cross-country event the next day, and that Nunnink said it was okay. Karan told Mia, "You guys are out of your mind," and told Mia to have Nunnink call her.

Nunnink called Karan that afternoon. She told Karan that Kory "did very well in his dressage" and assured her that "[i]t's fine." Karan told Nunnink, "[a]bsolutely not," and that she was "on [her] way down there." That evening, Karan traveled by airplane from Sacramento to Galway Downs to, in her words, prevent Mia from competing.

The next morning, Karan met with Mia and told her, "You're not running." Mia told Karan to talk to Nunnink and to not "'make a scene.'" Karan then met with Nunnink. Nunnink believed Kory was physically sound and that both Kory and Mia were capable of performing. She told Karan that Kory had been jumping all week, that

Mia was confident, and Kory was "good to go." Although Karan repeatedly told

Nunnink "no," Nunnink persuaded her to let Mia compete.

Karan testified that Nunnink's statement that Mia had done very well in dressage

was determinative in Karan's final decision to allow Mia and Kory to perform. Nunnink

testified she could not remember speaking to Karan about Mia's performance in dressage.

Karan and Stan watched Mia's cross-country run. Under the rules applicable at

Galway Downs, a rider is penalized each time a horse refuses to make a required jump.

A refusal includes not only the failure to make the jump, but also circling around to make

a second approach before taking the jump. Once a rider has four refusals, the rider is

eliminated from the competition. During her cross-country run, Kory had such refusals at

fences 4, 5, 10A, 17A, and 17B. Upon the fourth refusal, Mia was, by rule, eliminated

from competition and required to leave the course. However, she continued on. Kory hit

the fence at jump No. 19, causing a rotational fall—a fall in which the rear end of the

horse comes up over its front end, causing the horse to land on its back. Kory fell on

Mia, causing injuries that resulted in her death.

D. *The Trial Court's Grant of Nunnink's Section 631.8 Motion*

Following the presentation of the Erikssons' case-in-chief, Nunnink moved for the

entry of judgment pursuant to section 631.8. The trial court granted the motion. It

thereafter filed a written statement of decision.

The trial court found that the "release of liability" was "binding upon, and

enforceable against," the Erikssons. Under the release, Nunnink could only be liable if

11

damages were caused by her "direct, willful and wanton negligence." The court found that Nunnink's negligence, if any, did not rise to that "level of recklessness."

Regarding the Erikssons' wrongful death claims, the court specifically explained that these claims "are derivative of Mia's rights vis-à-vis Nunnink. Mia having expressly released her rights to assert any such claims against Nunnink, the [Erikssons'] claims for wrongful death are barred by the terms of the release."

The court analyzed the NIED claims differently. These claims, the court explained, "are not derivative of the rights of Mia." However, because "Karan signed the release as 'Rider's Parent,'" "the release extends, not only to Mia, but also to Karan . . . ." Because "Nunnink was not reckless," Karan's NIED failed.

As for Stan's NIED claim, the court stated that the release agreement did not foreclose Stan's claim because he did not sign the release. Nevertheless, the court denied Stan's NIED claim because, based on the court's "evaluation of the weight of the evidence, there [was] nothing that Ms. Nunnink did or omitted to do that materially increased the risk of harm to Mia . . . ."

We disagree to some extent with the court's determinations, and conclude that although Karan's signature on the release as Mia's "parent" did not make her a party to the release and Mia cannot, by signing the release, waive a cause of action on behalf of her heirs, the release can nonetheless be asserted as a defense to her parents' wrongful death and bystander NIED claims.

12

## III.  DISCUSSION

A. *The Release of Liability*

### 1. Standard of Review and the Terms of the Release

While often referred to as a defense, a release of future liability is more appropriately characterized as an express assumption of the risk that negates the defendant's duty of care, an element of the plaintiff's case.  "[C]ases involving express assumption of risk are concerned with instances in which, as the result of an express agreement, the defendant owes no duty to protect the plaintiff from an injury-causing risk.  Thus in this respect express assumption of risk properly can be viewed as analogous to primary assumption of risk. . . .  'In its most basic sense, assumption of risk means that the plaintiff, in advance, has given his *express* consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or leave undone . . . .  *The result is that the defendant is relieved of legal duty to the plaintiff; and being under no duty, he cannot be charged with negligence.*'  [Citation.]"  (*Knight v. Jewett* (1992) 3 Cal.4th 296, 308-309, fn. 4; see also *Allabach v. Santa Clara County Fair Assn.* (1996) 46 Cal.App.4th 1007, 1013; *Cohen v. Five Brooks Stable* (2008) 159 Cal.App.4th 1476, 1483.)

"'The existence of a duty is a question of law for the court.'  [Citation.]  So is the interpretation of a written instrument where the interpretation does not turn on the credibility of extrinsic evidence.  [Citation.]  It therefore follows that we must independently determine whether the release in this case negated the duty element of

13

plaintiffs' causes of action. [Citation.]" (*Allabach v. Santa Clara County Fair Assn.*, *supra*, 36 Cal.App.4th at p. 1011; see also *Cohen v. Five Brooks Stable, supra,* 159 Cal.App.4th at p. 1483 [interpretation of a written release is a legal question which, in the absence of parol evidence, is reviewed independently].)

We begin by setting forth the relevant terms of the release:

"This RELEASE OF LIABILITY is made and entered into . . . by and between KRISTI NUNNINK, hereinafter designated 'Trainer'; and the below signed, hereinafter designated, 'Rider'.

"In return for the use today, and on all future dates, of the property, facilities and services provided by Trainer, the Rider, their heirs, assigns and legal representatives, her[e]by expressly agree to the following: [¶] . . . [¶]

"3. Rider agrees to hold Trainer . . . completely harmless and not liable and release [Trainer] from all liability whatsoever, and AGREES NOT TO SUE them on account of or in connection with any claims, causes of action, injuries, damages, costs or expenses arising out of Rider's use of Trainer's services or facilities or presence upon any property used, including without limitation, those based on death, bodily injury, . . . except if the damages are caused by the direct, willful and wanton negligence of the Trainer. [¶] . . . [¶]

"5. Rider agrees to indemnify Trainer against, and hold her harmless from, any and all claims, causes of action, damages, judgments, costs or expenses including

14

attorney's fees, which in any way arise from Rider's use of Trainer[']s services or presence upon Trainer's facilities or property used by or with Trainer.  [¶] . . . [¶]

"9.  When the Trainer, Rider and (if minor) Rider's parent sign this Release, it will then be irrevocable and binding on all parties, subject to the above terms and conditions."

The document is signed by Nunnink as "Trainer," by Mia as "Rider," and by Karan as "Rider's Parent."  Stan did not sign the document.

2.  <u>The Meaning of Karan's Signature as "Rider's Parent"</u>

Initially, we observe that Mia was 17 years old at the time she signed the release and at the time of her death.  Although minors may enter into contracts (Fam. Code, § 6700), Family Code section 6710 provides that such contracts "may be disaffirmed by the minor before majority or within a reasonable time afterwards or, in case of the minor's death within that period, by the minor's heirs or personal representative."  (Fam. Code, § 6710; see *Celli v. Sports Car Club of America, Inc.* (1972) 29 Cal.App.3d 511, 517.)  The purpose of this statute "is to protect the minor from his own improvidence." (*Hohe v. San Diego Unified Sch. Dist.* (1990) 224 Cal.App.3d 1559, 1564.)  However, courts have held that the right to disaffirm a minor's contract does not extend to a release of liability signed by a parent on behalf of the minor.  (*Id.* at pp. 1564-1565; *Aaris v. Las Virgenes Unified School Dist.* (1998) 64 Cal.App.4th 1112, 1120.)

The release of liability was expressly "entered into" by and between Nunnink (as "Trainer") and Mia (as "Rider").  It is also signed by Karan over the words, "Rider's Parent."  According to paragraph 9 of the release, "[w]hen the Trainer, Rider and (if

15

minor) Rider's parent sign this Release, it will then be irrevocable and binding on all parties, subject to the above terms and conditions." By signing as Mia's parent, Karan approved of the terms of the release and understood that her signature made the release "irrevocable and binding." Under these circumstances, the release could not be disaffirmed.

Although Karan's signature prevented the agreement from being disaffirmed, it does not make her a party to the release. The parties are clearly identified in the first sentence: "This RELEASE OF LIABILITY is made and entered into . . . by and between KRISTI NUNNINK, hereinafter designated 'Trainer'; and the below signed, hereinafter designated 'Rider'." The only designated "Rider" is Mia. No other party is identified. Nor do the terms of the agreement obligate Karan in any way. Throughout the document, "Rider"—and only "Rider"—makes numerous promises, such as to assume risks, indemnify and hold Nunnink harmless, and release Nunnink from all liability. No promises, agreements, representations, or warranties are made by "Rider's Parent." Karan's only involvement in the agreement is to affirm, as the parent of a minor, that the release will "be irrevocable and binding on all parties"—i.e., Nunnink and Mia. Karan is not, therefore, a party to the agreement or contractually bound to any of Mia's promises. (Cf. *Daniels v. Sunrise Senior Living, Inc*. (2013) 212 Cal.App.4th 674, 680-681 [Fourth Dist., Div. Two] [decedent's heir signed residency agreement containing an arbitration clause solely as the decedent's agent and not in her personal capacity; as such, she did not agree to arbitrate her personal wrongful death claim].)

16

Although neither Karan nor Stan are parties to the release, the agreement is still essential to the analysis of their claims.  As we explain below, the agreement can be asserted as a defense to the Erikssons' wrongful death and NIED claims.  We must still, therefore, construe its terms and evaluate the Erikssons' argument that the release is ambiguous.

　　3.  Interpretation of the Release

"'A written release may exculpate a tortfeasor from future negligence or misconduct.  [Citation.]  To be effective, such a release "*must be clear, unambiguous, and explicit in expressing the intent of the subscribing parties*."  [Citation.]  The release need not achieve perfection.  [Citation.]  Exculpatory agreements in the recreational sports context do not implicate the public interest and therefore are not void as against public policy.  [Citations.]  [¶]  The determination of whether a release contains ambiguities is a matter of contractual construction.  [Citation.]  "An ambiguity exists when a party can identify an alternative, semantically reasonable, candidate of meaning of a writing.  [Citations.]  An ambiguity can be patent, arising from the face of the writing, or latent, based on extrinsic evidence."  [Citation.] . . . If an ambiguity as to the scope of the release exists, it should normally be construed against the drafter.  [Citations.]'  [Citation.]"  (*Cohen v. Five Brooks Stable, supra,* 159 Cal.App.4th at p. 1485.)  "'If a release of all liability is given, the release applies to any negligence of the defendant.  "'It is only necessary that the act of negligence, which results in injury to the releaser, be reasonably related to the object or purpose for which the release is given.'"

17

[Citation.]' [Citation.]" (*Ibid.*) "An act of negligence is reasonably related to the object or purpose for which the release was given if it is included within the express scope of the release." (*Benedek v. PLC Santa Monica* (2002) 104 Cal.App.4th 1351, 1357-1358.)

Initially, we note that the document is titled, in bold print and capital letters, "RELEASE OF LIABILITY." The unmistakable focus of the document is, generally, to protect Nunnink from liability arising from Mia's use of Nunnink's services and facilities. The terms of the release are not "buried in a lengthy document, hidden among other verbiage, or so encumbered with other provisions as to be difficult to find." (See *Leon v. Family Fitness Center (#107), Inc.* (1998) 61 Cal.App.4th 1227, 1232.)

Paragraph 3 of the release is straightforward. Trimmed of extraneous verbiage, it provides: "Rider agrees to hold Trainer . . . completely harmless and not liable and release [her] from all liability whatsoever, and AGREES NOT TO SUE [her] on account of or in connection with any claims, causes of action, injuries, damages, costs or expenses arising out of Rider's use of Trainer's services . . . , including without limitation, those based on death [or] bodily injury . . . , except if the damages are caused by the direct, willful and wanton negligence of the Trainer." By providing for a release of "all liability whatsoever," the release plainly encompasses liability for *future* negligence as well as any previously committed torts. (See *Benedek v. PLC Santa Monica, supra,* 104 Cal.App.4th at p. 1357 ["If a release of all liability is given, the release applies to any

18

negligence of the defendant."].)[7]  In essence, Mia agreed that Nunnink would not be liable for any damages that arose from Nunnink's services except for damages caused by Nunnink's "direct, willful and wanton negligence."

Paragraph 5 of the release agreement is substantially similar to paragraph 3, except in two respects.  First, although Mia agrees to "indemnify" and "hold [Nunnink] harmless" from claims, etc., it does not refer to a *release* of liability.  This appears to be a matter of form, not substance.  If Mia holds Nunnink harmless from claims or damages arising from Nunnink's services, she has effectively relieved Nunnink of responsibility for damages arising from her services.  Second, paragraph 5 includes no exception to Mia's agreement to hold Nunnink harmless, such as the exception for "direct, willful and wanton negligence" found in paragraph 3.  Nevertheless, under *Santa Barbara*, the purported unlimited agreement would be unenforceable to the extent it could protect Nunnink from liability for her gross negligence.  (See *Santa Barbara, supra,* 41 Cal.4th at p. 751 [release of liability, "to the extent it purports to release liability for future gross negligence, violates public policy and is unenforceable."].)

The Erikssons argue that the release is ambiguous, and therefore inapplicable to their claims, because it refers to Nunnink as a *trainer* rather than as a *coach*.  "Trainer,"

---

[7] Notwithstanding "traditional skepticism" concerning releases of liability for future negligence, courts will generally enforce such a release unless it "affects the public interest."  (*Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92, 98; see also *City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 755 (*Santa Barbara*).)  This public interest exception does not apply here.  (See *Guido v. Koopman* (1991) 1 Cal.App.4th 837, 842 [horseback riding is not "within the 'public interest' category"].)

19

they explain, "usually means the trainer of the horse"; therefore, they assert, the agreement was limited to liability arising from Nunnink's training of horses at Tahoe Meadows. If Nunnink wanted the release to apply to competitions where she functioned as a coach, they argue, "she should have drafted it that way." We reject this argument.

The meaning of the word "Trainer" is established in the opening sentence of the document in which the agreement is named, dated, and expressly entered into "by and between KRISTI NUNNINK, hereinafter designated 'Trainer' . . . ." By defining "Trainer" to mean Nunnink for purposes of the agreement, the term's only legal significance is to act as a placeholder or substitute for Nunnink's name throughout the document. Thus, for example, where the agreement states that "Rider agrees to hold Trainer . . . harmless," it means that Rider (i.e., Mia) agrees to hold Nunnink harmless. The term cannot reasonably be read as modifying or limiting the terms of the agreement.

Moreover, the interpretation proffered by the Erikssons is inconsistent with the document as a whole. Nunnink provided coaching services to Mia that included training the horse Mia rides. The release is written to protect Nunnink from liability in the broadest terms. She is released, for example, "from all liability whatsoever" and for claims arising out of Mia's "use of Trainer's services or facilities or presence upon any property used . . . ." The Erikssons' argument that the release protects Nunnink from all liability whatsoever as to her training services but provides no protection from liability arising from her coaching services is not, in light of the whole contract, reasonably plausible. (See Civ. Code, § 1641 ["The whole of a contract is to be taken together, so as

20

to give effect to every part, if reasonably practicable, each clause helping to interpret the other."].)

Further, at the time the release was signed, the relationship between the parties had been ongoing for at least two years, with Nunnink involved in all aspects of Mia's training and eventing activities. She was involved in selecting the competitions Mia entered and she attended all of Mia's events. The release clearly contemplates releasing Nunnink from liability for all of Mia's horse-related activities involving Nunnink's services. As such, the release is enforceable as between Nunnink and Mia.[8]

4. Effect of the Release on Karan and Stan's Cause of Action for Wrongful Death

In the release, Mia expressly agreed to release Nunnink from liability for claims, causes of action, and damages, including "those based on death." The trial court concluded that the Erikssons' "claims for damages for the wrongful death of Mia are derivative of Mia's rights vis-à-vis Nunnink. Mia having expressly released her rights to assert any such claims against Nunnink, the [Erikssons'] claims for wrongful death are barred by the terms of the release." Although we do not agree that the wrongful death claims are derivative and can be waived by Mia signing the release, Nunnink can assert

_____

[8] The Erikssons point out that the release was entered into many months before the Galway event, and argue that the parties did not contemplate that it would apply to the circumstances that occurred. Although the passage of time between the execution of a release and the incident may bear upon the interpretation and enforceability of the release, it does not compel a different conclusion in this case. The release was entered into only six months before the event that caused Mia's death, during the same eventing season, and after Mia had expressed her intention to increase her level of competition and compete in a two-star event. Nor is there anything in the release to suggest it was limited to particular events or a certain time period.

21

Mia's release and express assumption of risk as a defense to the Erikssons' claims and thereby limit the scope of her potential liability.

Our state Supreme Court has explained that wrongful death claims "are not derivative claims but are independent actions accruing to a decedent's heirs . . . ." (*Ruiz v. Podolsky* (2010) 50 Cal.4th 838, 841.) "Unlike some jurisdictions wherein wrongful death actions are derivative, [California's wrongful death statute] 'creates a *new cause of action* in favor of the heirs as beneficiaries, based upon their own independent pecuniary injury suffered by loss of a relative, and distinct from any the deceased might have maintained had he survived. [Citations.]'" (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 283; see also *Daniels v. Sunrise Senior Living, Inc., supra,* 212 Cal.App.4th at p. 680.)

Because a wrongful death claim is not derivative of the decedent's claims, an agreement by the decedent to release or waive liability for her death does not necessarily bar a subsequent wrongful death cause of action by her heirs. (6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1402, p. 825.) As explained in *Madison v. Superior Court* (1988) 203 Cal.App.3d 589, in which the decedent signed an agreement purporting to release, discharge, and waive any cause of action for wrongful death, "it is clear that [decedent] had no power or right to waive that cause of action on behalf of his heirs. [Citation.] This is a right which belongs not to [decedent] but to his heirs. 'The longstanding rule is that a wrongful death action is a separate and distinct right belonging

22

to the heirs, and it does not arise until the death of the decedent.' [Citation.]" (*Id.* at p. 596.)

Although Mia could not release or waive her parents' subsequent wrongful death claims, it is well-settled that a release of future liability or express assumption of the risk by the decedent may be asserted as a defense to such claims. (See, e.g., *Horwich v. Superior Court, supra,* 21 Cal.4th at p. 285; *Paralift, Inc. v. Superior Court* (1993) 23 Cal.App.4th 748, 755; *Saenz v. Whitewater Voyages, Inc.* (1990) 226 Cal.App.3d 758, 763-764.) As the *Madison* court explained: "[A] distinction must be made between the legal *ineffectiveness* of a decedent's preinjury release of his heirs's subsequent wrongful death action and the legal *effectiveness* of an express release of negligence by a decedent which provides a defendant with 'a complete defense.' [Citation.]" (*Madison v. Superior Court, supra,* 203 Cal.App.3d at p. 597; see also *Ruiz v. Podolsky, supra,* 50 Cal.4th at pp. 851-852 ["although an individual involved in a dangerous activity cannot by signing a release extinguish his heirs' wrongful death claim, the heirs will be bound by the decedent's agreement to waive a defendant's negligence and assume all risk."].)

The operation of this rule is illustrated in *Coates v. Newhall Land & Farming, Inc.* (1987) 191 Cal.App.3d 1. In that case, Charles Coates was a dirt bike rider who signed a release agreement before using the defendant's motorcycle riding park. (*Id.* at pp. 3-4.) The release included an "advance waiver of liability" and an "express assumption of the risk." (*Id.* at p. 7.) While riding his dirt bike in the park, Coates was fatally injured. (*Id.* at p. 4.) His heirs sued the owners of the park for wrongful death. The owners were

23

granted summary judgment based upon the release, and the Court of Appeal affirmed. (*Id.* at pp. 5, 10.) The court explained: "Behavior which is authorized is not wrongful and, logically, cannot be the basis of a wrongful death action. 'In its most basic sense, assumption of risk means that the plaintiff, in advance, has given his *express* consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or leave undone. [Fn. omitted.] . . . The result is that the defendant is relieved of legal duty to the plaintiff; and being under no duty, he cannot be charged with negligence.' [Citation.]" (*Id.* at p. 8, fn. omitted.)

The *Coates* court's explanation indicates that while the wrongful death cause of action is not derived from the decedent's rights, the pertinent duty of care is the duty of care the defendant owed to the decedent, which can be limited or negated by the decedent in a preaccident release. This rationale is also apparent in *Horwich v. Superior Court, supra,* 21 Cal.4th 272, which states that a "release executed by the decedent in circumstances involving primary assumption of the risk may also be asserted as a defense. [Citations.] In that situation, the decedent agrees in advance of the activity to relieve the defendant of any duty of care. [Citations.] *The defendant can owe no greater duty to the heirs than to the decedent*; thus the premise of any wrongful death action would fail at the outset." (*Id.* at p. 285, italics added.)

As such, the terms of the release effectively extinguished Nunnink's duty of ordinary care to Mia; in that Nunnink's duty toward the Erikssons could be no greater,

24

Nunnink can rely upon the release as a defense to the Erikssons' negligence cause of action for wrongful death.[9]

    5. <u>Effect of the Release on the Erikssons' Negligence Action for Emotional Distress</u>

    The trial court analyzed Karan's NIED claim differently from Stan's. Regarding Karan's claim, the court found that Karan was bound by the release because she signed it as Mia's parent, making her a party to the release. Karan, the court explained, thus "released her claims against Nunnink except to the extent that Nunnink was reckless." The court analyzed Stan's NIED claim, on the other hand, based on the fact that Stan did not sign the release; Stan's claim was evaluated under common law tort principles.

    Although we affirm the court's judgment, we get there by a different route. As we explained above, Karan was not a party to the release. As such, she did not release her claims against Nunnink any more than did Stan. Nevertheless, as we discuss below, with respect to the Erikssons' bystander NIED claims, Nunnink owed no greater duty of care toward the Erikssons than the duty she owed to Mia. Because Mia, by signing the release, negated Nunnink's duty of ordinary care toward her, Nunnink did not owe a duty of ordinary care to protect the Erikssons from the risk of the emotional distress they suffered.

---

    **9** As discussed *infra*, per the terms of the release, Nunnink could still be liable for Mia's death, but only if Mia's death was caused by her gross negligence (see *Santa Barbara, supra,* 41 Cal.4th 747) or Nunnink's direct, willful, and wanton negligence (as provided in the release).

Just as the wrongful death action is a separate and distinct right belonging to the decedent's heirs, the right to damages for NIED is a separate and distinct right belonging to the NIED plaintiffs. Our courts have distinguished "bystander" NIED claims from "direct victim" claims. (See, e.g., *Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1071.) As stated in *Huggins v. Longs Drug Stores California, Inc.* (1993) 6 Cal.4th 124, 129-130: "'The distinction between the "bystander" and the "direct victim" cases is found in the source of the duty owed by the defendant to the plaintiff.' [Citation.] 'Bystander' claims are typically based on breach of a duty owed to the public in general [citation], whereas a right to recover . . . as a 'direct victim' arises from the breach of a duty that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of the defendant's preexisting relationship with the plaintiff [citations]." The Erikssons' NIED claims are bystander claims.

Although the Erikssons' right to recover is based on a duty separate and distinct from that owed to Mia, the California Supreme Court, in *Dillon v. Legg* (1968) 68 Cal.2d 728 (*Dillon*), recognized that a defendant should be able to assert the same defenses to bystander liability as she would be able to assert against direct victim liability. The court stated: "[D]efendant has interposed the defense that the contributory negligence of the . . . [decedent] child contributed to the accident. If any such defense is sustained and defendant found not liable for the death of the child because of the contributory negligence of the . . . child, we do not believe that the mother or sister should recover for the emotional trauma which they allegedly suffered. In the absence of the primary

26

liability of the tortfeasor for the death of the child, we see no ground for an independent and secondary liability for claims for injuries by third parties." (*Id.* at p. 733.)[10]

This has been followed in *Balthazor v. Little League Baseball, Inc.* (1998) 62 Cal.App.4th 47 (*Balthazor*). There, the minor filed an action for injuries sustained when he was struck by a wild pitch during a baseball game. His mother asserted a cause of action for emotional distress. The court, in affirming summary judgment, found that the league did not increase the risk of injury to the minor plaintiff and, therefore owed no duty to him. (*Id.* at pp. 48-53.) In addressing the mother's NIED claim, the court noted: "Because we hold primary assumption of risk bars [the minor's] negligence action, his mother's claim for negligent infliction of emotional distress is similarly barred. (*Dillon*[*, supra,*] 68 Cal.2d [at p.] 733 . . . ['In the absence of the primary liability of the tortfeasor[,] . . . we see no ground for an independent and secondary liability for claims for injuries by third parties.'].)" (*Id.* at p. 53, fn 1.)

The *Balthazor* court's one-sentence analysis of the mother's claim, though brief, is telling. The reason why the mother's claim for emotional distress was barred is not because she, by attending her son's baseball game, assumed the risk of injury that could result from seeing her son hit by a ball; rather, her claim was barred because *her son assumed the risk* of being hit by playing the game. In short, the league could not be liable for the emotional distress of the mother if it was not liable to the baseball playing child.

---

[10] At the time of *Dillon*, contributory negligence was a complete defense to a plaintiff's action, just as express assumption of the risk is a complete defense to the Erikssons' claims here.

27

Just as the ballplayer's mother in *Balthazor* could not recover for her emotional distress because the child assumed the risk of the incident that caused the mother's distress, it would seem to follow that the Erikssons cannot recover for their emotional distress if Mia expressly assumed the risk of the incident that caused their distress.

The *Balthazor* case, however, did not involve a written release agreement; it was based upon the primary assumption of risk doctrine developed by *Knight v. Jewett, supra,* 3 Cal.4th 296, and its progeny. This is not a basis for distinguishing *Balthazor*. As *Knight* itself stated, a contract in which a party makes an "express assumption of risk" is analogous to the judicially-created primary assumption of risk doctrine. (*Knight v. Jewett, supra,* at pp. 308-309, fn. 4; see also *Santa Barbara, supra,* 41 Cal.4th at p. 779, fn. 57; *Allabach v. Santa Clara County Fair Assn., supra,* 46 Cal.App.4th at p. 1013.) In both situations, the defendant is relieved of a duty of care to protect the plaintiff from particular risks. (*Knight v. Jewett, supra,* at pp. 308-309 & fn. 4.) It follows that just as the primary assumption of risk doctrine was applied in *Balthazor* to the mother's bystander liability claim, Mia's express assumption of risk applies to the Erikssons's claims here.

A rule that a defendant can assert the direct victim's release in a bystander NIED case is consistent with the law's treatment of releases in wrongful death cases. As discussed above, in wrongful death cases, a release by the decedent can negate the defendant's duty of ordinary care to the decedent. Because the defendant can owe no greater duty to the heirs than to the decedent (*Horwich v. Superior Court, supra,* 21

28

Cal.4th at p. 285), the release can be asserted against the wrongful death plaintiffs to prove the absence of a duty of ordinary care (see, e.g., *Coates v. Newhall Land & Farming, Inc., supra,* 191 Cal.App.3d at p. 8; *Madison v. Superior Court, supra,* 203 Cal.App.3d at p. 597). The same rationale should apply in bystander NIED cases. Accordingly, just as Nunnink may interpose the defense of express assumption of the risk to the Erikssons' wrongful death suit, she may interpose the same defense to their bystander action for NIED.

Allowing a defendant to assert the direct victim's release as a defense to an NIED claim is also supported by sound policy reasons. We begin by observing that the "'*negligent* causing of emotional distress is not an independent tort but the tort of *negligence. . . .*' [Citation.] 'The traditional elements of duty, breach of duty, causation, and damages apply.'" (*Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 588.) The basic inquiry is "'whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. . . . [D]uty is . . . an expression *of the sum total of those considerations of policy* which lead the law to say that the particular plaintiff is entitled to protection.'" (*Dillon, supra,* 68 Cal.2d at p. 734, italics added.) "'[I]n considering the existence of "duty" in a given case several factors require consideration including "the foreseeability of harm to the plaintiff, the degree of certainty that plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and

consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.[”]’  [Citation.]”  (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 885-886.)

As pointed out in *Christensen*, *Dillon* “reflect[s] a public policy exception *which limits* the right of a bystander who did not suffer physical injury and was not threatened with such injury to recover damages for the emotional distress the bystander suffered as a result of witnessing negligent conduct which caused physical injury to a third person.  If any and all bystanders who witnessed the injury-causing event were permitted to recover for ensuing emotional distress, the defendant’s liability could be out of all proportion to the degree of fault.  [Citations.]  Public policy therefore justified a limitation on the statutory right to recover damages for the emotional distress injury.”  (*Christensen v. Superior Court*, *supra*, 54 Cal.3d at p. 885, italics added.)

The limitation imposed by *Dillon* dealt solely with the consideration of foreseeability.  “In order to limit the otherwise potentially infinite liability which would follow every negligent act, the law of torts holds defendant amenable only for injuries to others which to defendant at the time were reasonably foreseeable.”  (*Dillon, supra*, 68 Cal.2d at p. 739; see *Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 922.)

Just as the *Dillon* court limited a defendant’s duty to the plaintiffs who are reasonably foreseeable, the court also recognized that the presence of *other* “‘*overriding policy considerations*’” may run counter to the imposition of a duty on a defendant for

30

specific conduct.  (*Dillon, supra*, 68 Cal.2d at p. 739, italics added.)  Here, we believe such considerations are present.  Substantial policy reasons support our conclusion that when a participant in a sport has expressly assumed the risk of injury from a defendant's conduct, the defendant owes no duty of care to bystanders with respect to such risk.

First, we recognize that Karan and Stan, as Mia's parents, are foreseeable plaintiffs and, based on their contemporaneous observations, sustained injury. Additionally there is a close connection between Nunnink's alleged negligent conduct and the injury.  As *Dillon* indicates, "we . . . cannot doubt that a mother who sees her child killed will suffer . . . injury from shock."  (*Dillon, supra,* 68 Cal.2d at pp. 735-736.) From there, however, the policy considerations move decidedly in the direction of not imposing on Nunnink a duty to the Erikssons greater than the duty she owed to Mia.

Whether Nunnink is characterized as a trainer, coach, or instructor, her services dealt with the schooling of a horse and the teaching of a rider.  As the evidence demonstrates, Mia wished to improve and advance in the sport of eventing.  Presumably, Nunnink had the knowledge and skills to facilitate Mia's and Kory's improvement in the sport.  Nunnink, aware of the dangers involved in the sport, desired some protection from liability for risks inherent in the sport—hence the release.

In the absence of the release, Nunnink, or a person similarly situated as an instructor, would be less inclined to offer her services to Mia or others similarly situated. Thus, to encourage individuals to teach sports, some of which pose a high risk of injury, it is necessary to allow for enforceable releases of liability; otherwise, persons in

31

Nunnink's position might not provide the necessary instruction for safe participation in the sport. To then allow the instructor, who has secured an enforceable release from the participant, to be secondarily liable to a nonparticipant for the conduct covered by the release would, in essence, negate the effectiveness of the release and discourage the teaching of the sport. This adversely affects the community as a whole.

Additionally, for a coach or other involved entity to fully protect themselves from liability they, in essence, would be required to obtain releases from all close relatives who may watch the participant engage in the sport. This would be unworkable. Many sports involve team participation with numerous participants on a team. It is foreseeable that parents and siblings will attend team games. If the coach or sponsoring entity has received signed releases from the members of the team, it seems nonsensical to require each family member to sign a release similar to that signed by the participant in order to be protected from liability. The burden of acquiring such releases would be great.

Lastly, the reasonable contractual expectation of a coach or trainer who obtains an enforceable release of liability from the participant is that she is released from liability for negligent conduct. To allow an end run by those who may assert secondary liability destroys that reasonable contractual expectation.

For all the foregoing reasons, we conclude that where a participant in a sport has expressly assumed the risk of injury from a defendant's conduct, the defendant no longer owes a duty of care to bystanders with respect to the risk expressly assumed by the

participant. The defendant can therefore assert the participant's express assumption of the risk against the bystanders' NIED claims.

B. *Standards of Review of Ruling on Nunnink's Motion for Judgment and Burdens of Proof Regarding the Release and Gross Negligence*

Under section 631.8, in a bench trial, a party may move for judgment after the other party has completed his or her presentation of evidence. (§ 631.8, subd. (a).) In considering such a motion, the court "shall weigh the evidence and may render a judgment in favor of the moving party . . . ." (*Ibid.*) "In weighing the evidence, the court may exercise the prerogatives of a fact trier *by refusing to believe witnesses and by drawing conclusions at odds with expert opinion.*" (*County of Ventura v. Marcus* (1983) 139 Cal.App.3d 612, 615.)

On appeal "[w]e resolve all evidentiary conflicts in favor of the prevailing parties, and indulge all reasonable inferences possible to uphold the trial court's findings. [Citation.] . . . This court is without power to substitute its deductions for those of the trial court when the trial court could reasonably deduce two or more inferences from the facts." (*Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1254-1255; see, e.g., *Fink v. Shemtov* (2012) 210 Cal.App.4th 599, 608; *Roth v. Parker* (1997) 57 Cal.App.4th 542, 549-550.)

Here, the trial court found "that Ms. Nunnink's negligence . . . did not rise to the level of recklessness." Although distinctions can be made between gross negligence (as defined in *Santa Barbara, supra,* 41 Cal.4th at p. 754), willful and wanton conduct (as

33

indicated in the release), and recklessness (the trial court's phrase), for purposes of this case we understand them to be roughly synonymous and will evaluate the court's determination as a finding that Nunnink's conduct did not reach any of these standards. For ease of reference, we will refer solely to gross negligence.

In addressing the trial court's conclusion, we must first determine the applicable standard of review. In doing so, we must initially resolve who had the burden of proof relative to the issue of gross negligence. We conclude that once Nunnink established the applicability of the release, it was the Erikssons' burden to demonstrate by a preponderance of the evidence that Nunnink was grossly negligent.

Normally it is said that "[t]he standard of review of a judgment and its underlying findings entered pursuant to section 631.8 is the same as a judgment granted after a trial in which evidence was produced by both sides. . . . [T]he power of the reviewing court begins and ends with the determination as to whether, on the whole record, there is substantial evidence, contradicted or uncontradicted, that will support the trial court's determination." (*San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517, 528.)[11]

---

[11] "Substantial evidence is evidence that a rational trier of fact could find to be reasonable, credible, and of solid value. Under the substantial evidence standard of review, we view the evidence in the light most favorable to the judgment and accept as true all evidence tending to support the judgment, including all facts that reasonably can be deduced from the evidence, and must affirm the judgment if an examination of the entire record viewed in this light discloses substantial evidence to support the judgment." (*Mealy v. B-Mobile, Inc.* (2011) 195 Cal.App.4th 1218, 1223.)

34

This standard, however, can be "misleading" in cases when the judgment for one party is based on the other party's failure to satisfy a burden of proof. (See *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 279.) When, for example, the plaintiff has the burden of proving the elements of his claim and the court finds he has failed to satisfy that burden, judgment will be for the defendant—even if there is no evidence supporting the defense. There being *no* evidence for the defense, there could be no *substantial* evidence in the record to support the judgment. Yet, the plaintiff, who failed to prove his case, would clearly not be entitled to reversal of the defense judgment. Plainly, the substantial evidence standard, as it is usually stated, is an inadequate appellate tool in that situation.

Thus, "[w]hen the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden and that party appeals . . . the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*Shaw v. County of Santa Cruz, supra,* 170 Cal.App.4th at p. 279; see also *Horn v. Oh* (1983) 147 Cal.App.3d 1094, 1099 ["By asserting that there was no substantial evidence to support the jury's verdict for respondent, appellant is in fact claiming that he proved negligence as a matter of law, and such is not established unless the only reasonable hypothesis is that negligence existed"];

35

*Ermoian v. Desert Hospital* (2007) 152 Cal App.4th 475, 506 [Fourth Dist., Div. Two]

[same].)

Here, the Erikssons alleged their claims of wrongful death and NIED were based

on Nunnink's "negligence and fault." Viewing the complaint in isolation, it would seem

to be beyond dispute that the Erikssons had the burden of proving such negligence and

fault. (See *Lopez v. City of Los Angeles* (2011) 196 Cal.App.4th 675, 685; see also

*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 861 ["party desiring relief" bears

burden of proof]; Evid. Code, § 521 ["The party claiming that a person did not exercise a

requisite degree of care has the burden of proof on that issue."].) Nunnink, however,

interposed a defense of assumption of the risk and relied on the release.[12] As a defense,

Nunnink had the burden, as the *Santa Barbara* court stated, of "establishing the validity

of [the] release as applied to the case at hand." (*Santa Barbara, supra,* 41 Cal.4th at p.

780, fn. 58.)

For the reasons discussed, Nunnink has established the validity of the release in

the sense that it was binding and enforceable against Mia, except insofar as it would

protect Nunnink from future liability arising from her gross negligence. If, as here, the

---

**12** Nunnink's answer alleged affirmative defenses based on "assumption of the risk" without specifically alleging the release. Any defect in pleading on this point has been waived by the Erikssons. Nunnink's reliance on the release in her defense has been clear since at least February 2009 when she filed her motion for summary judgment. (See *Eriksson I, supra,* 191 Cal.App.4th at p. 837.) Trial in this case took place in January 2012. The Erikssons do not assert any surprise or prejudice due to the failure to assert the release in the answer. Any arguments that defenses based on the release were not properly pleaded, therefore, are waived. (See 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 1102, p. 530.)

validity of the release is established and yet Nunnink can still be liable if she acted with gross negligence, this question arises: Is it Nunnink's burden, as part of proving her defense, to prove she did not act with gross negligence (thus bringing her conduct within the scope of the release), or is it the Erikssons' burden to establish that Nunnink was grossly negligent (thus taking her conduct outside the scope of the release) in order to prove the elements of their case? The answer, we conclude, is that once Nunnink proves the validity of the release and its applicability to this case, the Erikssons have the burden of establishing that Nunnink was grossly negligent.

This conclusion follows from the rule that "[t]he party claiming that a person did not exercise a requisite degree of care has the burden of proof on that issue." (Evid. Code, § 521.) Although there may be a dispute as to what the requisite degree of care is, this rule mandates that whatever the degree of care is, the party arguing that the defendant did not exercise that degree of care has the burden of proof on that issue.[13]

Because it was the Erikssons' burden of proving that Nunnink acted with gross negligence and the trial court found she was not grossly negligent (or "reckless"), we

---

[13] A party seeking to avoid provisions of a contract has the burden to prove those facts supporting justification for avoidance. (See *Brutoco Engineering & Construction, Inc. v. Superior Court* (2003) 107 Cal.App.4th 1326, 1331 [Fourth Dist., Div. Two] [party seeking to avoid arbitration has the burden to show unconscionability]; *Mission Viejo Emergency Medical Associates v. Beta Healthcare Group* (2011) 197 Cal.App.4th 1146, 1154 ["Once the moving party has established the existence of the arbitration agreement, the burden shifts to the party opposing arbitration to establish, by a preponderance of the evidence, the factual basis for any defense to enforcement."].) Here, the Erikssons' seek to avoid provisions of the release; as such, they have the burden to prove those facts justifying avoidance of the release's provisions.

review the record to determine whether the evidence establishes, as a matter of law, that Nunnink breached this standard of care by allowing (or persuading Karan to allow) Mia to compete in the Galway Downs cross-country event with Kory.[14]

C. *The Evidence Does Not Establish That Nunnink Was, as a Matter of Law, Grossly Negligent or Engaged in "Willful and Wanton Negligence"*

As discussed above, because Nunnink established the validity of the release and its applicability to the Erikssons' claims, the Erikssons were required to prove that Nunnink acted with gross negligence or, in the words of the release, "direct, willful and wanton negligence." "'Gross negligence,' as defined in *Santa Barbara,* means either a want of even scant care or an extreme departure from the ordinary standard of conduct." (*Eriksson I, supra,* 191 Cal.App.4th at p. 857, citing *Santa Barbara, supra,* 41 Cal.4th at p. 754.) The *Santa Barbara* court also suggested that "gross negligence" is similar to "reckless conduct." (*Santa Barbara, supra,* at p. 781.)[15]

The meaning of "willful" or "wanton" is discussed in *Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714, disapproved on another point in *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at page 854, footnote 19. "[W]illful" and "wanton," the

---

**14** We are concerned in this case with the burdens of proof at trial. Nothing in this part alters the burdens on a defendant moving for summary judgment. (See *Santa Barbara, supra,* 41 Cal.4th at p. 780, fn. 58; *Eriksson I, supra,* 191 Cal.App.4th at p. 849.)

**15** Ordinary negligence, the *Santa Barbara* court explained, "consists of a failure to exercise the degree of care in a given situation that a reasonable person under similar circumstances would employ to protect others from harm." (*Santa Barbara, supra,* 41 Cal.4th at pp. 753-754.)

38

court explained, are "similar terms" meaning that "'"'the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.' [Citation.]"' [Citations.]" (*Calvillo-Silva v. Home Grocery, supra,* at p. 728.) Similar language was used in *Santa Barbara*, where the court stated that "willful and wanton negligence" is "conduct by a person who may have no intent to cause harm, but who intentionally performs an act so unreasonable and dangerous that he or she knows or should know it is highly probable that harm will result." (*Santa Barbara, supra,* 41 Cal.4th at p. at 754, fn. 4; see also *Donnelly v. Southern Pacific Co.* (1941) 18 Cal.2d 863, 869-870 [defining "[w]anton and reckless misconduct" in a similar manner].)

The willfulness and gross negligence standards are distinguished in *Calvillo-Silva v. Home Grocery, supra,* 19 Cal.4th 714, which stated: "Unlike negligence, which implies a failure to use ordinary care, and even gross negligence, which connotes such a lack of care as may be presumed to indicate a passive and indifferent attitude toward results, willful misconduct is not marked by a mere absence of care. Rather, it '"involves a more positive intent actually to harm another or to do an act with a positive, active and absolute disregard of its consequences.'"' [Citations.]" (*Id.* at p. 729; see also *Donnelly v. Southern Pacific Co., supra,* 18 Cal.2d at pp. 871-872 [conduct that constitutes gross negligence under California law does not necessarily constitute "wanton and reckless misconduct"].)

In addition to the facts as set forth in part II. of this opinion, the Erikssons called two experts, a board certified equine surgeon and a coach/trainer of riders and horses, to testify.

Dr. Elaine Carpenter is a board certified equine surgeon. She viewed videotapes of Kory in competition and opined on Kory's health, neurological condition, and the circumstances surrounding his performance. Overall, she observed both lameness and brain injury in Kory that existed prior to the rotational fall that killed Mia.

Dr. Carpenter noted that Kory had sustained an injury to both of his stifles prior to Galway Downs. And in the fall at Ram Tap, Kory's head hit the ground hard enough to cause a significant concussion.

In viewing the videotape of Kory's trot out at Galway Downs, Dr. Carpenter noticed that Kory was not bearing as much weight on his right front leg as he was on his left front leg. His shoulder stayed high in the right front and low on the left, indicating the horse is right-front lame. There is also a lack of fetlock drop in the right front leg, another sign of lameness. The lameness and decreased fetlock drop is difficult to see when the videotape is played at normal speed.

The American Association of Equine Practitioners (AAEP) has a one-to-five scale for measuring lameness, where five means the horse is unable to bear weight on the limb. Dr. Carpenter opined that Kory's lameness was a "one" on that scale, and very difficult to see. Any veterinarian who looked at the videotape of the trot out at Galway Downs in normal motion would probably not notice any lameness.

40

Dr. Carpenter testified that the videotape of the Galway Downs dressage event shows Kory's right-front lameness as well as neurological problems. When Kory's right foot hits the ground, his head comes up, and when the left foot hits the ground, his head stays down. This, Dr. Carpenter stated, is a clear indication of lameness, which could be characterized as two on the AAEP scale. A veterinarian would be able to notice the lameness during dressage. Indeed, she believed that Kory's lameness during dressage is very obvious and can even be seen by a layperson.

As to the neurological problems, Dr. Carpenter observed an inconsistency in Kory's gait in the dressage, which was indicative of issues stemming from a concussion. In comparing videotapes of the Ram Tap dressage with the Galway Downs dressage, it was clear to Dr. Carpenter that Kory is concentrating at Ram Tap and not concentrating at Galway Downs, another sign of a concussion. She also observed Kory "foot drag[ging]" during the Galway Downs dressage, but not during the Ram Tap dressage. Dragging of the hind feet, she stated, is a characteristic symptom of neurological problems.

Some dressage judges would probably have the level of knowledge needed to see that something was wrong with the horse. Dr. Carpenter believed that a coach or trainer familiar with Kory who watched Kory's Ram Tap and Galway Downs dressage events should have been able to see that something was wrong with Kory at Galway Downs.

Dr. Carpenter explained that a concussion is a very difficult thing to assess and the symptoms may not appear until a horse is under pressure, when greater neural processing speeds are needed. During competition, a horse experiences a great deal of stress and

41

pressure to jump correctly. When a horse with a concussed brain is presented incorrectly to a jump, it has difficulty making quick decisions to take off early or insert another step before taking off. At both Ram Tap and Galway Downs, Mia incorrectly presented Kory to various jumps. At Ram Tap, Kory was able to compensate for Mia's imperfect presentations. At Galway Downs, however, when Kory was brought incorrectly to jumps, he was unable to process the situation quickly enough. In short, when Kory was presented incorrectly to jumps at Ram Tap, he was able to perform; at Galway Downs, he was not.

Dr. Carpenter stated that as Kory approached jump No. 19, he kept changing his mind about jumping. Kory dug in his rear feet as if he were trying to come to a sliding stop, but his brain was saying "you better get this front end over this jump or we're going to crash into it." Kory's brain had slowed such that he was unable to process the situation. A horse with a healthy brain and body could have overcome Mia's mistakes. In Dr. Carpenter's opinion, the rotational fall at jump No. 19 was due to Kory's neurological deficits caused by the concussion suffered at Ram Tap.

On cross-examination, Dr. Carpenter testified that Dr. Bracken's report indicated that Kory's complete musculoskeletal examinations were within normal limits after the fall at Ram Tap. Dr. Bracken further indicated that Kory trotted out "sound" as part of her examination the day after the fall. The neurological examination was also within normal limits. Nowhere in Dr. Bracken's reports did she indicate she was suspicious of lameness.

A grade of "one" on the AAEP scale is very mild and by itself would not mean a horse was unfit to compete. Dr. Carpenter conceded that it is rare to find a "very top-level" horse that does not have a mild degree of lameness at any moment. She believed that most veterinarians would call a horse with a "two" grade on the AAEP lameness scale unfit. She did not believe Kory's deficits were very apparent to the committee that viewed his trot out.

During cross-examination, defense counsel took Dr. Carpenter through the videotape of Mia and Kory's cross-country regimen, up to the fatal jump. Kory appeared physically unaffected by any lameness at the first jump, "athletic and healthy" in clearing jump No. 2, and "very good" going over jump No. 3. Kory was brought to jump No. 4 incorrectly and had problems in his spatial orientation such that he could not figure out what to do with the jump. The horse hit his abdomen and hooked his stifle on the fence. The horse had good clearance over jump No. 5A, and looked very good on jump No. 8. As to a number of the jumps, Kory took stutter steps, which Dr. Carpenter attributed to the fact that he was brought to the jumps incorrectly. Kory had no difficulty clearing jumps Nos. 11 and 12A, and jumped well at No. 13. Approaching jump No. 14, Kory was starting to show some fatigue, although he cleared the jump very well. Kory did well at jump No. 15A and cleared jump No. 16 with a lot of height. His stomach may have grazed the fence at jump No. 17A. After jump No. 18, Mia and Kory appeared to be off balance. In approaching jump No. 19, Kory began his jump from a point too close to a planter, struck his abdomen at the top of the planter, and caught his hind leg on the

43

planter. This caused a rotational fall, throwing Mia off the horse. Approximately 15 to 20 percent of the falls in eventing are rotational falls.

David Johnson is a trainer of horses and riders, and has served as a coach in equestrian events. He has never been a judge in three-day eventing.

Johnson viewed the videotapes of Kory's performances at Ram Tap and Galway Downs. At Ram Tap, Kory suffered a near rotational fall—a "rugged fall for a horse"—with his nose hitting the ground and his forelegs hitting his chest. At Galway Downs, Kory appears injured, and not as healthy as he was at Ram Tap.

After a fall like the one Kory suffered at Ram Tap, Johnson would have been very concerned about the trauma to Kory's head and postponed any activities for Kory for at least one month. Johnson acknowledged that Dr. Bracken's report after the Ram Tap fall shows mentation normal, which would indicate Kory was not, at that time, displaying any mental problems from the fall. He further acknowledged that Dr. Bracken's report indicated that Kory was checked and rechecked and the complete examination was normal. Nonetheless, after Dr. Bracken indicated that Kory should be monitored, the trainer should have had Kory's regular veterinarian look at him.

Johnson testified that he could not see any signs of lameness in Kory based upon viewing the Galway Downs dressage in isolation. However, he concluded that Kory was lame at Galway Downs based upon a comparison with Kory's performance at Ram Tap. At Ram Tap, Johnson said, Kory was balanced and pleasant during dressage; at Galway Downs, he was tense and his walk was not free flowing. In Johnson's opinion, it would

have been obvious to a professional trainer who watched the Ram Tap and Galway Downs dressage performances that Kory was not sound at Galway Downs. A trainer should have seen it from a "mile away."[16]

Johnson believed that at Ram Tap Kory did a very good job in handling the jumps where Mia did not have him properly positioned. At Galway Downs, however, Kory is very tense and is drifting to the left side. Additionally, Kory continually changed his leads (i.e., switched the legs that lead his canter or gallop), which is almost always caused by pain and fatigue.

In Johnson's opinion, the trainer has the ultimate responsibility of determining whether a horse and rider will run in an event. If an underage rider and his or her parents want to compete and the trainer says no, the horse does not compete. Johnson did not believe it was wise to move Mia up to the two-star level because of her performance at lower events.

We believe in viewing all the evidence, including the Erikssons' experts' testimony, it cannot be said that as a matter of law, the Erikssons established that Nunnink acted with either gross negligence or willful and wanton negligence.[17]

---

[16] Johnson testified that it was totally irresponsible for Nunnink to tell Karan that Kory did well in the dressage at Galway Downs.

[17] In fact, based on this record, even were we to use the "substantial evidence" standard of review, we would conclude that there is ample evidence to support the conclusion that Nunnink was not grossly negligent. Further, there is substantial evidence that a reasonable trier of fact could conclude that she was not negligent as to the events leading to Mia's death.

We begin by noting that, as we indicated in *Eriksson I*, if Nunnink knew or should have known that Kory was unfit to jump and, in spite of this knowledge, affirmatively misrepresented Kory's condition to Karan to prevent Karan from withdrawing Mia from the event, Nunnink may have acted with gross, or willful and wanton, negligence. (See *Eriksson I, supra,* 191 Cal.App.4th at p. 857.) The evidence, however, does not establish these facts as a matter of law.

Although Kory was indisputably injured at Ram Tap, there was ample evidence that the injury did not render him unfit for the Galway Downs event. Dr. Bracken, the veterinarian who examined Kory the day of and the day after the Ram Tap fall indicated that Kory had a concussion and needed to be watched carefully. However, Kory's musculoskeletal and neurological examinations were within normal limits and nothing in Dr. Bracken's reports indicated lameness. Nunnink testified that, in the period between Ram Tap and Galway Downs, Kory appeared "perfectly healthy" and had been jumping well during lessons. At Galway Downs, Dr. Nyrop, the event veterinarian who conducted the in-barn inspection of Kory and observed Kory's trot out, saw no significant lameness in Kory and found him fit to compete. Quarles, the president of the ground jury, also observed the trot out and saw no signs of lameness in Kory. Quarles also judged Kory's dressage event and saw nothing to suggest Kory was lame or unfit. Although the Erikssons' experts testified that Kory had signs of lameness during the Galway Downs trot out and dressage, the trial court was not required to accept their opinions. (See *County of Ventura v. Marcus, supra,* 139 Cal.App.3d at p. 615.)

46

Moreover, Dr. Carpenter testified that it was rare to find a "very top level" horse that does not have a mild degree of lameness at any moment. As to the trot out at Galway Downs, any veterinarian looking at the videotape would probably not notice any lameness. And as for the dressage only, some judges would have the level of knowledge needed to see that something was wrong with the horse. Relative to the issue of Kory's concussion, Dr. Carpenter, while believing it was the cause of Kory's fall, testified that it is a condition that is very difficult to assess. Further, on being taken through each of Kory's jumps at Galway Downs, Dr. Carpenter agreed that on the vast majority of jumps, Kory looked good and had no problem clearing them.

David Johnson testified that in viewing the Galway Downs dressage videotape in isolation he could not see any signs of lameness.[18]

In sum, the record does not support a conclusion that Nunnink as a matter of law was grossly negligent relative to the present incident.

## IV. DISPOSITION

The judgment is affirmed. Respondent Nunnink is awarded her costs on appeal.

CERTIFIED FOR PARTIAL PUBLICATION

KING _____

J.

---

[18] Dr. Johnson testified that while in isolation he could see no lameness, when comparing the videotape of the Galway Downs dressage with that of Ram Tap, Kory was tense and his walk was not as free flowing as at Ram Tap; a trainer should have been able to notice this. Nunnink testified that during the dressage at Galway Downs the wind was blowing and there were large trees and flags flapping and papers flying, all of which can distract a horse.

We concur:

RICHLI
                        Acting P. J.

MILLER
                             J.